## Richmond

## JANICE LEONARD MCCREERY v. FRANCIS DANIEL MCCREERY, JR.

September 1, 1977.

Record No. 761067.

Present: All the Justices.

*Betty A. Thompson* for appellant.

*Martin A. Gannon* for appellee.

Poff, J., delivered the opinion of the Court.

This appeal arises from an inter-parental dispute over child custody.

By decree entered March 12, 1976, Francis Daniel McCreery, Jr., was awarded a divorce *a mensa et thoro* on the grounds of desertion. Ten days earlier, his wife, Janice Leonard McCreery, had been granted temporary custody of their two daughters, then aged two and four. Following *ore tenus* hearings and pursuant to a letter opinion dated April 8, 1976, the chancellor entered an order on April 16, 1976 awarding permanent custody to Mr. McCreery and visitation rights to his wife. The chancellor denied Mrs. McCreery's motion to stay execution of the order pending appeal.

The crucial question raised by Mrs. McCreery is: "Did the chancellor err in expressly holding that this Court has abolished the 'tender years presumption' and in failing to find it controlling in this case?" This question posits two issues, *viz.*.

whether the "presumption" has been abolished, and, if not, whether it is controlling here.

■ In *Mullen* v. *Mullen*, 188 Va. 259, 270-71, 49 S.E.2d 349, 354 (1948), we held that "the mother is the natural custodian of her child of tender years, and that if she is a fit and proper person, other things being equal, she should be given the custody". In his letter opinion, the chancellor construed our decision in *Burnside* v. *Burnside*, 216 Va. 691, 222 S.E.2d 529 (1976), "to overrule *Mullen* and all earlier cases in Virginia to the extent that there exists any presumption in favor of the mother as being the natural custodian."

As appears from our decision in *Harper* v. *Harper*, 217 Va. 477, 229 S.E.2d 875 (1976) (decided after the date of the chancellor's letter opinion) affirming the chancellor's application of the presumption, and as the husband concedes on brief, *Burnside* did not overrule *Mullen* and its progeny. On the contrary, *Burnside* fully acknowledged the *Mullen* rule. Analyzing the circumstances disclosed by the evidence, quoting the chancellor's conclusion that "all things are not equal in this case", and citing *Portewig* v. *Ryder*, 208 Va. 791, 794, 160 S.E.2d 789, 792 (1968), where we said that the rule "is not to be applied without regard to the surrounding circumstances", we invoked the maxim that, notwithstanding the "presumption" and other "secondary" matters, "the primary and controlling consideration is the child's welfare." *Burnside* v. *Burnside, supra,* 216 Va. at 692-93, 222 S.E.2d at 530-31.

Confusion about the nature and function of the so-called "tender years presumption" results from confusion between two important societal values — the right of a parent to custody of its minor child and the right of a child to the custodial care of a parent. In the scale of values, society gives priority to the latter. This is so principally because society owes one of its dependent members a duty superior to the duty it owes a self-sufficient member.

The "tender years presumption" is relevant only in custody disputes between natural parents. Yet, it has nothing to do with the respective rights of the two parents. Rather, it has to do with the right of the child. The "presumption" is, in fact, an inference society has drawn that such right is best served when a child of tender years is awarded the custodial care of its mother. *See Harper* v. *Harper, supra,* 217 Va. at 479, 229 S.E.2d at 877. The

courts, acting in the interest of society at large, apply that inference irrespective of the rights of the parents. And that inference controls unless, in a particular case, it is overcome bv evidence that the right of the child will be better served by awarding the child the custodial care of its father.

■ By definition, the inference controls only when the evidence shows that the mother is fit and "other things" affecting the child's welfare are equal. Even when it appears that both mother and father are fit parents, other things yet may be unequal. These "other things" are things which affect the quality of the custodial care received by the child. Quality is determined not only in terms of the training, talents, and resources of the custodian but also in terms of the motivation of the custodian to make proper provision for the physical needs of the child, its psychological and emotional health, its intellectual and cultural growth, and its moral development. Although fully qualified in other respects, a person may be too ill-suited by temperament or too preoccupied with personal pursuits to administer proper care to a child. Comparing the quality of care offered by two parents, the courts are guided by histories of past performance and prospects for future performance. If the comparison results in equipoise, the inference that the right of the child is best served by awarding the child the custodial care of the mother controls. We must decide whether, as Mrs. McCreery contends, the inference is "controlling in this case."

The letter opinion discloses that, notwithstanding his erroneous reading of *Burnside,* the chancellor considered what he called the "criteria" explicated in *Mullen* and based his decision upon "all of the surrounding circumstances" affecting the quality of custodial care offered by the two parents. Looking to the "environment for raising the children", he noted the difference in living accommodations. When Mrs. McCreery left her husband in January 1976, she and the children moved into "a two-bedroom apartment in an apartment complex" located several miles from the jointly-owned marital domicile. Mr. McCreery remained in the home, "a spacious, attractive and well-appointed detached residential dwelling with separate bedrooms for the children", located within two blocks of a school, the family's church, and the home of the children's babysitter. He testified that he planned to "buy out my wife's interest in the house" and live there with the children.

■ As Mrs. McCreery points out, "[s]uitability of the home is not to be determined *merely* by comparing physical accommodations or material advantages." (Emphasis added). *White* v. *White*, 215 Va. 765, 768, 213 S.E.2d 766, 768 (1975); *accord, Clark* v. *Clark*, 217 Va. 924, 234 S.E.2d 266 (1977). While such a comparison, standing alone, is never dispositive, the adequacy of living facilities and the convenience of the location of the home may be highly relevant to the determination of the suitability of the child-rearing environment, and the chancellor committed no error in considering the comparison in this case.

The chancellor also considered what he called "the effect on [Mrs. McCreery's] life and her habits and behavior of her employment with the Federal Government, and of her attachment to her supervisor and fellow employee, Mr. Short." Mrs. McCreery argues that the chancellor denied her equal protection of the laws by "treating the mother differently from the father on the basis of her employment". In effect, she says that the right of a working mother to the custody of her child is equal to that of a working father, and that the decree constituted a judicial denial of her constitutional rights.

We examine the facts underlying the constitutional question. The McCreery's first daughter was born in January 1972. Three months later, Mrs. McCreery decided she wanted to return to work. Although she had had four years' experience as a school teacher, she applied for different work. Mr. McCreery testified that she had told him "over and over again" that "she hated teaching because it was babysitting." In April 1973, six months before the second child was born in October, Mrs. McCreery accepted a position which she held for five months. Three months after the birth of the second child, she began filing applications for a position with the Federal Government. In October 1974, when the older child was two years old and the younger one year old, Mrs. McCreery accepted a job at a level classified four grades below the level for which she had qualified. She testified that her husband wanted her to go back to work and that the reason she did so was to earn money to pay certain family bills. Mr. McCreery said that the family had no unpaid bills and that he had asked his wife not to return to work. The chancellor found that Mrs. McCreery had "sought outside employment to relieve her of the stress and anxiety of her

household duties and chores and in connection with the raising of the children".

As federal employees, both parents were frequently required to make TDY (temporary duty) trips to distant cities. "Nine or ten times" Mrs. McCreery was accompanied by Mr. Short. On one such trip, she took the children to the home of a friend in Seaford and, without leaving word where she could be reached, went to Norfolk and registered at the same motel where Mr. Short was registered. After Mrs. McCreery left her husband, Mr. Short left his wife and stayed with two friends in an apartment. Mrs. McCreery gave him a key to the apartment where she and the children were living, and during the week preceding the custody hearing he spent two nights in her apartment and "stored" some of his clothes, shaving gear, and other personal effects there.

The chancellor drew what he called an "inescapable" inference but found that the evidence was insufficient to show that the children had been subjected to "any immoral influences" or that Mrs. McCreery "is an unfit mother." He concluded, however, that she "has, perhaps unconsciously, relegated these two little girls to a position secondary to her job and her relationship with Mr. Short."

Accepting the premise that the rights of two working parents to the custody of their children are coequal, see Code § 31-15 (Repl. Vol. 1973), we reject Mrs. McCreery's contention that the custody decree was the product of invidious discrimination. The chancellor did not divide working parents into separate classes according to sex. Nor did he base his decision upon a finding that mothers are not proper custodians unless they are full-time housewives. Rather, comparing the quality of custodial care offered by two working parents, he decided that the effect of Mrs. McCreery's employment on her "habits and behavior", i.e., her preoccupation with "the glamour of her work" and "her relationship with her supervisor", was such that "the interests of the two children in this case would be best served" by awarding the children the custodial care of a working father who "is willing to place the welfare of these children above all else, to a much greater extent than the mother".

Aside from the constitutional question, Mrs. McCreery

contends that the chancellor's decision is not supported by the evidence and, therefore, constitutes an abuse of discretion. Several witnesses testified that Mr. McCreery performed many household chores and personal services for the children. On occasion, he prepared hot meals and washed the dishes, changed diapers and did the laundry, bathed and dressed the children, and took them to and from the babysitter's home where the children were left while the McCreerys were at work. The babysitter said that "[h]e is a mother figure really in their eyes". One witness stated that Mrs. McCreery had told her that Mr. McCreery "had been as much a mother to the girls as she had". Based upon his findings during four hours of examination, Dr. Joel Ganz, Supervisor of Psychiatry at Georgetown University School of Medicine, described Mr. McCreery as "a very nurturing parent". "He's not only willing to be a father, he's willing to be a mother, in being able to serve both roles. I think he has a tremendous function for the children . . . rather than the usual working father role."

In his testimony concerning his wife's treatment of the children, Mr. McCreery recounted certain incidents which he felt were indicative of indifference and neglect. Mrs. McCreery's witnesses, her aunt, her sister, her brother-in-law, and a neighbor, testified that she had been a good mother to her children. The witnesses called by Mr. McCreery, none of whom were related to either party, described the differences in the relationship between the children and their two parents. The babysitter, who had been employed by both parties, testified that when the father comes to pick up the children, "they're overjoyed", "thrilled", "very excited", "all over him"; when the mother comes, "[t]hey are usually matter of fact, get their coats on and ready to go". After Mrs. McCreery left her husband and moved into the apartment, the children "went through a bad time. They were insecure . . . went back to carrying their security blankets." A neighbor who had known the McCreerys for more than nine years testified that the children were "constantly sitting in their daddy's lap" but that she had "never seen [Mrs. McCreery] be very affectionate with the children." Some time before the second child was born, Mrs. McCreery told the witness "that if she had to do this all over again, speaking of having children, that she didn't think that she would." Another family friend who frequently exchanged visits with the McCreerys testified that

the children "are very open, spontaneous, and affectionate with their father. I have never really seen them be affectionate at all to their mother." "[W]hen I compare the two, the mother and the father, the way I see the children respond to both of them, they certainly do seem to be much better off with their father." Dr. Ganz was asked to describe the effect upon the children of having "another man, other than their father, spending two or three evenings a week at the apartment with the mother and every other weekend visitation privileges with the father". Dr. Ganz replied: "I would think the children in this situation might regress, they might start to thumb-suck if they'd stopped, they might get into bed-wetting and security blankets, things they have given up as independents, they might regress back to."

■ We hold that the evidence was sufficient to show that "other things" were not equal in this case; hence, the "tender years presumption" was not controlling. While, because of his misimpression that the "presumption" had been abolished, the chancellor did not expressly pronounce that the presumption had been overcome, the findings stated in his letter opinion were tantamount to a pronouncement that "other things" were not equal. Those findings, based as they were upon evidence heard *ore tenus*, and his decision that the interests of the children will be best served by awarding them the custodial care of their father are presumed to be correct. Reading from the transcript, we cannot say that the chancellor abused his discretion or that his decision was plainly wrong, and we will affirm the final order.

*Affirmed.*

I'ANSON, C.J., and CARRICO, J., dissent
No dissenting opinions.