COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present:  Judges Alston, McCullough and Huff
Argued at Alexandria, Virginia

JOSEPH A. WIENCKO, JR.

                                         OPINION BY
v.      Record No. 2078-12-4        JUDGE STEPHEN R. McCULLOUGH
                                          JULY 23, 2013
AKEMI TAKAYAMA

FROM THE CIRCUIT COURT OF FREDERICK COUNTY
John E. Wetsel, Jr., Judge

Marilyn Ann Solomon (Thomas W. Ashton; Gerardo M. Delgado;
Law Firm of Marilyn Solomon and Associates, on brief), for
appellant.

Peter W. Buchbauer (Buchbauer and McGuire, P.C., on brief), for
appellee.

Joseph A. Wiencko, Jr., father, assigns four errors in connection with his divorce and custody proceedings. He argues (1) the trial court violated his rights under the Equal Protection Clause of the United States Constitution when it awarded custody to mother "based primarily upon Father's decision to stay home and raise the children rather than focus on employment," (2) the court abused its discretion "in awarding Father the vast majority of the marital debt, while awarding Mother nearly all of the marital assets," (3) the court abused its discretion "in relying upon the report of the Guardian *ad Litem*, and in eventually accepting wholesale her recommendations as to custody and visitation, when the Guardian *ad Litem* failed to do a thorough investigation and submitted said report and recommendation without even meeting with the children which were the subject of the custody and visitation dispute," and (4) the court abused its discretion "in failing to prohibit the Mother from all international travel with the children, instead of limiting its prohibition to just Japan, because she can get the children to Japan by going through another country."

BACKGROUND

Father and mother were married on August 21, 1999. They separated in June of 2011. Mother and father have four boys: the eldest was born in 2000, followed by twins born in 2002, and finally the youngest, who was born in 2004.

## I. CUSTODY OF THE CHILDREN

The evidence established that both father and mother were loving parents who were very devoted to their children. The court indicated in its finding of facts and conclusions of law that "[b]oth parents are very concerned about the welfare of their children, and both appear to be sincerely motivated to do what they each perceive is in the children's best interests." At the time of the relevant custody hearings, the children were doing very well in school and were actively engaged in activities such as the Boy Scouts.

The court heard testimony from mother and father and from several of their friends. Since 2004, father has assumed a greater role in caring for the children, a role that only grew more significant with the loss of his employment in 2009.

Dr. Bernard J. Lewis prepared a detailed parental capacity evaluation for each parent. He wrote that mother "presented as a very bright, emotionally sensitive, and psychologically healthy individual." In contrast, Dr. Lewis concluded father's answers suggested he possesses "certain narcissistic quality." Dr. Lewis further stated in his report that "[t]here is clear and substantial evidence from the interviews with the boys that [father] has provided them with considerable inappropriate information which undermines [mother's] parental authority with the boys and their respect for her as a parent." Finally, Dr. Lewis's report stated that father's "rigid, inflexible style likely results in a 'one size fits all' approach to parenting. This was apparent from his descriptions of his children and his focus on their intellectual and academic abilities with little regard to their social or behavioral development." At trial, Dr. Lewis testified that, during the

- 2 -

evaluations, father came across "as very rigid, inflexible, insensitive, and self-centered." In his view, father was "just focused on [the children's] academics . . . and relatively blind to any other issues or problems with them." Dr. Lewis formed a "strong opinion that [mother] is the better parent" with regard to assessing and meeting the emotional, intellectual, and physical needs of the children.

The guardian *ad litem* recommended that sole legal and physical custody be awarded to mother. The guardian *ad litem*

> acknowledge[d] Father's devotion to his children and his role these past few years as a "stay at home dad." However, the guardian *ad litem* strongly believes that this role was not assumed just because of Mother's career, but because of Father's inability to obtain employment and/or his unwillingness to compromise on some "must haves" for his desired employment situation.

Mother, a professional violinist, worked throughout the marriage, teaching music and occasionally traveling out of town to perform. Father holds a master's degree in mechanical engineering. Initially, he worked from home as a consultant to the telecommunications industry. For a time, he earned a very comfortable living. For example, in 2004, father earned $197,600. Gradually, the contracts began to diminish. In 2008, he earned $93,689. In 2009, father's lone remaining client did not renew his consulting contract, and father has been unemployed since that time. He did not seek further employment. Instead, father devoted himself to taking care of the children and the household, becoming, in his own words, "Mr. Mom." The loss of father's substantial income after 2009 required him to make significant withdrawals from his retirement accounts to maintain the household.

The trial court issued a detailed written opinion analyzing the statutory custody factors found in Code § 20-124.3. The court noted that mother "is psychologically best suited to be the primary custodian of the children, and she has the present ability to provide an independent household for the family, whereas the father does not." In discussing "[t]he role which each parent

- 3 -

has played and will play in the future, in the upbringing and care of the child," the court specifically acknowledged father's extensive role in raising the children, including preparing meals, taking care of laundry, and running errands, as well as his loving relationship with the children. The court observed, however, that father "unilaterally decided to become a stay at home Father" after he lost his consulting contract. In addressing the circumstances that led to the dissolution of the marriage, the court wrote that

> the catalyst for the final breakup of the marital relationship was the Husband's loss of employment. In his late 40's and confronted by the loss of his lucrative employment, the Husband understandably became depressed. Rather than shouldering the burden of seeking new employment, he elected to withdraw into the home and devote himself to his children. This was basically a retreat from reality.

Later, in the context of discussing the role each parent has played in the upbringing and care of the children, the court made the following observations:

> As previously noted, after losing his employment in 2009, the Father withdrew from the adult world of employment. His obsession with his children's intellectual and personal development is a product of his withdrawal from the world of adults. Parenting requires balancing, and the Father has lost his sense of parental perspective with respect to his role as a Father. While he has commendably engaged his children in a wide range of activities designed to develop their intellectual, social, and spiritual life, he has totally abrogated his responsibility to physically provide for his family. He has returned to his childhood and become actively engaged in children's activities like scouting and recreation. He took them to a variety of amusement parks. These are salutary and commendable activities provided that you have the money to fund them.
>
> If granted custody, the Father plans to return to his childhood home in Herndon to live with his mother, thereby completing his retreat from the adult world.

Mother, on the other hand, "would remain in the Winchester area to maintain consistency and routine in the children's lives." The court also found that she "is willing to make adjustments to her work schedule to be more available for her children."

- 4 -

The court ordered joint legal and physical custody with primary physical custody going to mother. The court further established a detailed visitation schedule for father that included the first, third, and fifth weekends of every month, as well as weekday evening visitation on Tuesdays and Thursdays and summer visitation for up to six weeks.

Father objected to the custody award. He filed a motion to reconsider in which he argued that "the Court violated his 14th Amendment right to Equal Protection under the Constitution when it granted custody of the children to the mother on the basis that he left his job to be a stay-at-home dad and raise the children." The court denied the motion to reconsider.

## II. EQUITABLE DISTRIBUTION

The principal marital assets consisted of a home with an outstanding note of approximately $400,000 and little to no equity, a violin bow, several automobiles and household furnishings, and retirement accounts from mother's employers with a marital share worth approximately $68,000. Father had largely depleted the marital share of his retirement accounts and little was left in those accounts. Father still had over $270,000 in retirement accounts that were his separate property. Credit cards in father's name had an outstanding balance of approximately $37,000.

The court wrote a memorandum opinion in which it thoroughly reviewed the evidence and addressed each of the Code § 20-107.3 factors. Among other things, the court acknowledged father's significant financial contributions to the marriage, including father's contribution of $40,000 of his separate property to satisfy a judgment against mother and his contribution of $200,000 of father's separate property toward the purchase of the home. The court also made note of the fact that, at a time when mother was embroiled in litigation, he purchased mother's violin bow at a cost of $16,000 and later gave it to her so as to insulate that asset from bankruptcy.

The court awarded the marital home to father and the bow to mother. With regard to credit card debt, the trial court held that "[t]he parties will pay the credit cards in their individual names

without contribution from the other spouse." As to marital retirement accounts, the court provided as follows in a section of its opinion titled "Pension and Retirement Plans":

> Each party shall retain their respective pension and retirement plans free of the interest of the other party. There does not appear to be any marital portion remaining in the SEP IRA; however, to the extent that there is, that shall go to the Husband.
>
> The Husband has substantial separate property, his retirement accounts greatly exceed those of the Wife, and he is receiving the marital residence, whatever it may be worth.

### III. THE INVESTIGATION OF THE GUARDIAN *AD LITEM*

Father and mother requested the appointment of a guardian *ad litem*. The court appointed Karen M. Holman, who had served as the guardian *ad litem* for the oldest child in the context of father's ultimately unsuccessful effort to obtain a protective order on behalf of all four children against mother.[1] Holman had interviewed the children during the course of her investigation concerning application for the protective order. She did not, however, interview the children anew for purposes of the child custody litigation. Father objected to the court relying on the report of the guardian *ad litem*, arguing that she was biased and had not conducted a thorough investigation.

Dr. Lewis interviewed the children and discussed his findings with Holman. Holman found that the information Lewis gleaned from his interviews with the children was essentially the same as what Holman had learned from her previous interviews with the children. In addition to Dr. Lewis, Holman spoke with father and mother, the maternal grandparents, the paternal grandmother, and counsel for both parties. Holman also spoke with a former neighbor of father and mother, and she reviewed discovery responses and documents, videos, and other materials provided to her by the

---

[1] Father has contended that mother abused the oldest of the children. The record establishes that when one of the children obstreperously refused to go to his room, mother dragged him to his room by his feet. The child suffered a bruise when his head struck a door. Child Protective Services investigated the matter but did not file any charges or take further action. Mother acknowledged the inappropriateness of her actions.

parties. Holman later issued a second report containing a final recommendation for the court. Her invoice reflects that she spent nearly 42 hours on the case.

## IV. TRAVEL RESTRICTIONS

Mother originally is from Japan. She arrived in the United States in 1991 to study music. She obtained an undergraduate degree from the University of Wyoming, followed by a master's degree from the Cleveland Institute of Music. Mother and father have visited Japan on an annual basis to allow the children to see their maternal grandparents. Mother's current employment is in the United States. Since coming to the United States, she has not returned full time to Japan and has no plans to do so. She testified that she recognizes that the children love their father and "value what [he] has to offer." She said she does not want to stop the relationship the children have with their father. The children were raised entirely in the United States. Mother denied that she has any intention to take the children to Japan permanently. In March of 2008, she became a citizen of the United States while, according to father, retaining her Japanese citizenship.

Throughout the litigation, father has been gravely concerned about the possibility that mother might permanently return to Japan with the children. His fear is grounded in the fact that Japan has not signed multilateral treaties such as the 1980 Hague Convention on the Civil Aspects of Child Abduction. According to father, he would effectively have no recourse were mother to permanently return to Japan and take the children with her. For her part, mother asked the court to allow her to travel to Japan, where her parents and other family reside. The final divorce decree provides that "Mother may not take the children to Japan without the Father's written consent or a court order approving the trip."

ANALYSIS

I. THE TRIAL COURT DID NOT VIOLATE FATHER'S EQUAL PROTECTION RIGHTS.

Father does not challenge the facial constitutionality of Virginia's child custody statutes. Instead, he raises an "as applied" challenge, contending that awarding custody to mother rather than to him violated his rights under the Equal Protection Clause. He argues that the trial court based its custody decision "on the biased, archaic and stereotypical view that men are supposed to provide for the family financially and have no place in the household with children." Appellant's Br. at 27.

The Fourteenth Amendment of the Constitution provides in relevant part that "no state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Absent clear evidence to the contrary in the record, the judgment of a trial court comes to us on appeal with a presumption that the law was correctly applied to the facts." Yarborough v. Commonwealth, 217 Va. 971, 978, 234 S.E.2d 286, 291 (1977). To succeed on an "as applied" challenge, where a litigant does not challenge the validity of a legislative classification, but, rather, claims that a court has violated the Equal Protection Clause in a particular divorce case by discriminating on the basis of sex, the litigant must make an unambiguous showing that the trial court's decision was grounded in invidious discrimination on the basis of sex. McCreery v. McCreery, 218 Va. 352, 237 S.E.2d 167 (1977). See also Mandell v. Haddon, 202 Va. 979, 992, 121 S.E.2d 516, 526 (1961) (noting the purpose of the Equal Protection Clause is to protect against invidious discrimination).

A number of cases from Virginia and other states have examined arguments similar to those made by father. Most relevant is the McCreery decision from the Supreme Court. In that case, the Court rejected the mother's claim that she had been "treat[ed] differently from the father on the basis of her employment." 218 Va. at 356, 237 S.E.2d at 169. After examining the record, the Supreme Court concluded that

> [t]he chancellor did not divide working parents into separate classes according to sex. Nor did he base his decision upon a finding that mothers are not proper custodians unless they are full-time housewives. Rather, comparing the quality of custodial care offered by two working parents, he decided that the effect of Mrs. McCreery's employment on her "habits and behavior", *i.e.*, her preoccupation with "the glamour of her work" and "her relationship with her supervisor", was such that "the interests of the two children in this case would be best served" by awarding the children the custodial care of a working father who "is willing to place the welfare of these children above all else, to a much greater extent than the mother".

Id. at 357, 237 S.E.2d at 170. The Court held that the custody determination was not the product of "invidious discrimination." Id. See also Lawrence v. Lawrence, 628 P.2d 542, 543 (Wyo. 1981) (rejecting father's claim that the custody determination was made on the "improper and illegal assumption that custody" should be awarded to the mother because this argument "completely disregards the other findings of fact made by the court which reflect consideration given by it to all aspects of the relationship in an effort to make the award which would be in the best interests of the child"); Burroughs v. Burroughs, 239 S.E.2d 357, 358 (Ga. 1977) ("The record shows that the trial judge awarded custody to the husband because this would be in the children's best interests, not because the wife was career-minded.").

We have little difficulty in concluding that the trial court did not violate the Equal Protection Clause in granting custody of the children to mother rather than to father. The record demonstrates that the trial court carefully analyzed all the statutory factors in Code § 20-124.3 and reached a decision based on the entirety of the evidence. The statements father singles out do not reflect the breadth of the trial court's opinion. The trial court had before it the report of Dr. Lewis, the recommendation of the guardian *ad litem*, and other evidence, all of it pointing clearly in the direction of giving primary or sole custody to mother. Certainly, the trial court made plain that it viewed negatively father's decision to abandon a once thriving career in favor of devoting himself exclusively to the children. This was not, however, a situation involving a

father who by mutual consent sacrificed a career in favor of assuming a caretaker role. Rather, in the context of all the evidence, the court noted the negative impact of father's assumption of a provider role followed by a unilateral decision on his part to abandon that provider role to stay at home with the children.

Father urges us to compare the outcome in this case with an unreported decision by the same trial judge in which the court commended the mother for sacrificing her career for the sake of her family. We decline father's invitation to engage in this exercise. Divorce cases involve such widely varying factual situations, and the statutory standard governing the adjudication of these cases is so broad and flexible, that, unlike, for example, the employment context, making such case-to-case comparisons would serve no useful purpose in determining the validity of an equal protection claim.

The record reflects that the trial court carefully weighed the evidence and based its decision on the individual facts of the case and the factors listed in the statute. Father has fallen far short of making an unambiguous showing that the trial court made its custody determination based on invidious discrimination.

II. THE TRIAL COURT ERRED IN CONSIDERING FATHER'S SEPARATE PROPERTY RETIREMENT ACCOUNTS IN AWARDING MOTHER THE TOTALITY OF THE MARITAL RETIREMENT ACCOUNTS.

Father does not challenge the trial court's classification of property. He does, however, raise a number of arguments in connection with the court's equitable distribution of marital property. On appeal, a trial court's equitable distribution award will not be overturned unless the Court finds "an abuse of discretion, misapplication or wrongful application of the equitable distribution statute, or lack of evidence to support the award." McIlwain v. McIlwain, 52 Va. App. 644, 661, 666 S.E.2d 538, 547 (2008).

Retirement accounts in mother's name constituted one of the principal marital assets. The marital share of these accounts was worth approximately $68,000. In a section of the trial court's

findings of fact and conclusions of law captioned "Pension and Retirement Plans," the court held as follows:

> Each party shall retain their respective pension and retirement plans free of the interest of the other party. There does not appear to be any marital portion remaining in the SEP IRA; however, to the extent that there is, that shall go to the Husband.
>
> *The Husband has substantial separate property, his retirement accounts greatly exceed those of the Wife,* and he is receiving the marital residence, whatever it may be worth.

(Emphasis added). Plainly, the existence of father's separate property retirement accounts influenced the court's decision to award the marital property retirement accounts entirely to mother. Father argues that it was error for the trial court to award mother the retirement accounts, which constituted marital property, based, at least in part, on the fact that father had retirement accounts that were his separate property. We agree with father.

We first turn to the text of the statute. At the outset, Code § 20-107.3(A) directs the court to classify property and to segregate marital property from separate property. Code § 20-107.3(E) then provides a list of factors that govern the equitable distribution of marital property and the apportionment of marital debt. Significantly, the General Assembly did not list the value of separate property as an equitable distribution factor. In contrast, the General Assembly has directed trial courts to consider the availability of all financial resources, including separate property, in fashioning a spousal support award or when varying from the presumptive child support guidelines. See Code §§ 20-107.1(E)(1) (in determining spousal support, trial court to consider, among other things, parties' "financial resources . . . of whatever nature"), 20-108.1(B)(10) (in determining whether to vary child support from the presumptive guidelines, trial courts should consider the "financial resources . . . of each parent"). Had the General Assembly intended to include all property, rather than just marital property, in the equitable distribution calculus, it would have done so in Code § 20-107.3(E).

Taking separate property into account would not only import into Code § 20-107.3 a factor the General Assembly chose not to include, it also would be inconsistent with the purpose of the equitable distribution statute. The General Assembly was well aware of the problems associated with the regime that existed before equitable distribution, where spouses received property based chiefly on title and the needs of the divorced spouse were provided for through spousal support awards. Report of the Joint Subcommittee Studying Section 20-107 of the Code of Virginia To the Governor and The General Assembly of Virginia, House Doc. No. 21, 1982 Session, at 4. In enacting the equitable distribution statute, the General Assembly sought to

> recognize marriage as a partnership to which each party contributes, albeit not always equally, to the well-being of the family unit. These contributions, both monetary and nonmonetary, have value and should be weighed, along with other factors, in allocating marital assets or their dollar equivalent between the parties when they are divorced or their marriage is dissolved.

Report of the Joint Subcommittee Studying Section 20-107 of the Code of Virginia To the Governor and The General Assembly of Virginia, House Doc. No. 21, 1982 Session, at 7. See also Sawyer v. Sawyer, 1 Va. App. 75, 78, 335 S.E.2d 277, 279 (1985) ("The legislature enacted Code § 20-107.3 to give the courts power to compensate a spouse for his or her contribution to the acquisition of property *obtained during the marriage* without regard to title when the marriage is dissolved." (emphasis added)).

The purpose of equitable distribution differs from the purpose animating an award of spousal and child support. This Court has recognized that

> support and equitable distribution awards are based on entirely different considerations and serve entirely different purposes. Court ordered support is intended to place the burden on a spouse or parent to maintain his or her family rather than placing that burden on the state. Furthermore, the amount of support is based on current needs of the spouse and/or children and the ability of the other spouse/parent to pay from current assets. The "equitable distribution" statute, however, is intended to recognize a marriage as a partnership and to provide a means to divide equitably the

- 12 -

> wealth accumulated during and by that partnership based on the
> monetary and non-monetary contributions of each spouse.

Williams v. Williams, 4 Va. App. 19, 24, 354 S.E.2d 64, 66 (1987).

We hold that the value of separate property is irrelevant to the equitable distribution analysis.[2] Whether a divorcing spouse commands vast resources of separate property, or, conversely, possesses little or no separate property, is a circumstance external to the marriage and to the accumulation of wealth during the marriage. The trial court's decision to award mother the marital property retirement accounts based in part on the existence of father's separate property retirement accounts constitutes a misapplication of the equitable distribution statute. Consequently, we reverse and remand the equitable distribution award for further proceedings not inconsistent with this opinion.[3]

III. THE TRIAL COURT PROPERLY CONSIDERED THE REPORT OF THE GUARDIAN *AD LITEM*.

Father next argues that the trial court committed an abuse of discretion in relying on the report of the guardian *ad litem*. He contends that the guardian *ad litem* failed to conduct a thorough investigation and, in particular, failed to meet with the children who were the object of the custody and visitation dispute. We agree with mother that this issue should be reviewed under an abuse of

---

[2] Of course, *past* contributions of separate property made for the benefit of the household during the marriage must be considered in making the equitable distribution. Code § 20-107.3(E)(2).

[3] Father also argues that the trial court, in contravention of our holding in Reid v. Reid, 7 Va. App. 553, 565, 375 S.E.2d 533, 540 (1989), improperly considered his earning capacity in making the equitable distribution award. The record does not support this contention. The court referenced father's unilateral decision to stay at home and abandon the workforce as one of the circumstances that led to the dissolution of the marriage. In contrast to Reid, the trial court here did not base its equitable distribution award on father's earning capacity. Father also argues that the court abused its discretion in awarding most of the marital assets to mother while awarding most of the debt to father. He stresses the value of his own contributions, monetary and non-monetary, to the marriage. In light of our remand, we do not address this argument.

discretion standard. This standard affords the trial court appropriate flexibility in determining to what extent it should rely on the recommendation of the guardian *ad litem*.

The guardian *ad litem* serves a vital role in our judicial system. The task of the guardian *ad litem* is to rise above the fray of the contending parties to ensure that the interests of persons under a legal disability are "represented and protected." Code § 8.01-9(A). See also Rule 8:6 (the role of the guardian *ad litem* for a child is to "vigorously represent the child, fully protecting the child's interest and welfare"). Although the Supreme Court has held that a trial court should consider the recommendation of the guardian *ad litem*, see Bottoms v. Bottoms, 249 Va. 410, 420, 457 S.E.2d 102, 108 (1995), that holding presupposes that the report prepared by the guardian *ad litem* rests on an adequate investigative foundation.

It is true, as father notes, that the guardian *ad litem* did not interview the children in connection with the divorce case. Standard A of The Standards to Govern the Performance of Guardians *ad litem* for Children specifies that "in fulfilling the duties of a Guardian *ad Litem* . . ., an attorney shall [m]eet face-to-face and interview the child."[4] Significantly, however, Holman previously served as the guardian *ad litem* for the oldest child in connection with a protective order sought by father approximately seven months prior to her appointment as guardian *ad litem* for all four children in the divorce proceeding. It is undisputed that Holman previously had interviewed the children. Father correctly observes that the purpose of a protective order differs from the purpose of a divorce case. Still, the facts gleaned in the earlier litigation were relevant in the divorce proceeding and would have gone a long way towards educating the guardian *ad litem* about the dynamics of this family.

---

[4] The standards are available at:
http://www.courts.state.va.us/courtadmin/aoc/cip/programs/gal/children/gal_performance_standards_children.pdf

Moreover, Dr. Lewis, who was hired in the context of the divorce case to prepare a parental assessment, interviewed the children. Holman and Dr. Lewis compared notes. In addition, Holman spoke with father and mother, the maternal grandparents, the paternal grandmother, and the attorneys for father and mother. Holman interviewed a former neighbor of father and mother, and she reviewed discovery responses and documents, videos, and other materials provided to her by the parties. Based on these facts, the trial court did not abuse its discretion in considering the report and recommendation of the guardian *ad litem* and in attributing to it whatever weight the court deemed appropriate.[5]

In so concluding, we do not downplay the importance of the standards that govern guardians *ad litem*. Nevertheless, it would be foolish to reflexively reverse every time a guardian *ad litem* does not follow these standards to the letter or because an investigation could have been more thorough. First, guardians *ad litem* must adapt the depth of their investigation to the unique facts of each case. Second, the fact that the cost of the guardian *ad litem*'s investigation must be borne by the parties in a divorce – parties who often are under financial strain – counsels against compelling a guardian *ad litem* to exhaust every conceivable avenue of investigation. Finally, the abuse of discretion standard, which governs our decision here, means that

> a reviewing court [must] show enough deference to a primary decisionmaker's judgment that the court does not reverse merely because it would have come to a different result in the first instance. Accordingly, when a decision is discretionary, the court has a range of choice, and its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.

Lawlor v. Commonwealth, 285 Va. 187, 212-13, 738 S.E.2d 847, 861 (2013) (citation and internal punctuation omitted).

---

[5] Father also complains about the failure of the guardian *ad litem* to "ascertain the veracity of allegations that [mother] savagely beat one of the children." Appellant's Br. at 41. Due to Holman's service as guardian *ad litem* for the oldest child in connection with father's unsuccessful attempt to obtain a protective order, she was well aware of the facts of that incident.

Finally, the record does not support father's assertion that the trial court accepted "wholesale" the recommendations of the guardian *ad litem*. The guardian *ad litem* recommended that mother have sole legal and physical custody of the children, whereas the court provided for joint legal and physical custody, with primary physical custody to mother. In addition, the court provided a more generous visitation schedule for father than what the guardian *ad litem* had recommended.

#### IV. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WITH REGARD TO THE TRAVEL RESTRICTIONS IMPOSED ON MOTHER.

The trial court forbade mother from traveling to Japan with the children. The court did not forbid mother to travel to other countries with the children. Father argues that the trial court "abused its discretion when it failed to prohibit the Mother from all international travel with the children." Appellant's Br. at 46. He fears that mother could travel with the children to another country, and from there take the children to Japan. Father highlights the fact that Japan is not a signatory of the Hague Convention on the Civil Aspects of International Child Abduction. Therefore, he is concerned that he would be without any remedy should mother take the children there permanently.

Code § 20-107.2 provides that "[u]pon entry of a decree providing . . . for a divorce . . . the court may make such further decree as it shall deem expedient concerning the custody or visitation and support of the minor children of the parties as provided in Chapter 6.1 . . . ." Such further decree may include travel restrictions placed upon the parent who seeks custody or visitation. We afford the trial court broad discretion in these matters. Brown v. Brown, 30 Va. App. 532, 538, 518 S.E.2d 336, 338 (1999). "[A]s long as evidence in the record supports the trial court's ruling and the trial court has not abused its discretion, its ruling must be affirmed on appeal." Id. The paramount consideration for the court remains the best interest of the children. Code § 20-124.2.

- 16 -

We find no abuse of discretion on these facts. First, the record does not support father's apprehension that mother might whisk the children away to Japan and permanently settle there. The evidence establishes that mother has every intention to remain in the United States for the long term. Mother has resided in the United States since 1991. Her career has been and remains in the United States. She has become a United States citizen. Mother testified that she has no plans to permanently move to Japan, and she recognizes the importance of the role father plays in the children's lives. Her trial testimony was corroborated by Dr. Lewis's report. He noted that mother "repeatedly stated that she understood the boys love their father, are close to their father, and need their father in their lives." Second, to address the risk, however remote, that mother might take the children to Japan and never return, the trial court, over mother's objection, prohibited her from taking the children to Japan without approval from father or authorization from the court. The court struck a perfectly sensible balance on the facts presented. We find no error with regard to the travel restrictions imposed on mother.

CONCLUSION

We reverse the judgment of the court with respect to the equitable distribution award and we remand for a new equitable distribution hearing. In all other respects, the judgment of the trial court is affirmed.

Affirmed in part, reversed in part, and remanded.