COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, O'Brien and Raphael
Argued at Lexington, Virginia

**PUBLISHED**

MARK KYLE CHAPHE

v.     Record No. 0270-23-3

WILLIAM CARSON SKEENS, ET AL.

OPINION BY
JUDGE MARY GRACE O'BRIEN
APRIL 2, 2024

FROM THE CIRCUIT COURT OF SCOTT COUNTY
John C. Kilgore, Judge

Robert Starnes (Starnes Law Office, on brief), for appellant.

Linda Tiller (Tiller and Tiller, on brief), for appellees.[1]

Mark Kyle Chaphe (father) appeals a close-relative adoption order entered in favor of

William Carson Skeens and Pamela Deniece Skeens—the maternal grandparents of father's three

children, T.C., K.C., and J.C.  Father asserts six assignments of error.  The first five challenge

factual findings underlying the court's determination that father withheld his consent to the adoption

contrary to the best interests of the children under Code § 63.2-1205.

The sixth assignment of error asserts a constitutional due process violation.  Specifically,

father argues that the court erred in holding that the factors in Code § 63.2-1205 "balance the

[p]arent's [f]undamental [r]ight to the [u]pbringing of their children" under the Due Process Clause

of the Fourteenth Amendment, because the statute does not ask "whether the [p]arent has

participated in major upbringing[] decisions of the children such as signing them up for basketball."

---

[1] The children's guardian ad litem, Sidney N. Rhoton, notified the Court of his support
for appellees.  Rule 5A:19(d).

BACKGROUND[2]

"Because the circuit court heard evidence *ore tenus*, its factual findings are 'entitled to the same weight accorded a jury verdict[] and . . . will not be disturbed on appeal unless plainly wrong or without evidence to support' them." *Geouge v. Traylor*, 68 Va. App. 343, 347 (2017) (alterations in original) (quoting *Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 44 (2014)). We view the evidence in the light most favorable to the grandparents, the prevailing party below, and grant them the benefit of all reasonable inferences. *Lively v. Smith*, 72 Va. App. 429, 432 (2020).

Father and Melody Skeens Chaphe (mother)[3] are the biological parents of three children. The oldest, T.C., was born in 2013 while mother was incarcerated. K.C. was born in late 2014. On May 16, 2015, father was in a car accident while driving under the influence. Mother, T.C., and K.C. were also in the car, which was "totaled" from the accident. Father was convicted of two counts of child endangerment, driving without insurance, and possession of synthetic marijuana; he was referred to drug court. After the accident, the department of social services removed T.C. and K.C. from their parents, and the children lived with a family friend for approximately ten months. During this time, the children were sexually abused.

In 2016, T.C. and K.C. returned to live with mother and father, and J.C. was born. Beginning in December 2017, father was incarcerated for 14 months for violating the terms of drug court. Mother became overwhelmed, and she asked the grandparents to take then-four-year-old T.C. because he was having "some behavioral issues" that she could not

---

[2] The record in this case was sealed. "[T]his appeal requires unsealing certain portions to resolve the issues raised by the parties. To the extent that certain facts mentioned in this opinion are found in the sealed portions of the record, we unseal only those portions." *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 n.1 (2022).

[3] By per curiam order, the Court affirmed mother's separate appeal of the adoption order. *See Chaphe v. Skeens*, No. 0309-23-3 (this day decided).

manage. The grandparents immediately assumed care of T.C., who has remained in their care ever since.

In May 2018—while father was still incarcerated—mother, K.C., and J.C. were living with her boyfriend when they lost electricity; mother asked a friend to keep K.C. and J.C. DSS received a report that mother had left the children with the friend for several months. To prevent the children from entering foster care, DSS entered into a safety plan with mother and the grandparents, who assumed custody of K.C. and J.C. Mother then missed an appointment with her probation officer and was incarcerated for violating her probation. In July 2018, because both parents were incarcerated, a juvenile and domestic relations district court awarded the grandparents temporary joint legal and physical custody of the three children.

The grandparents enrolled T.C. and K.C. in school. A speech therapist came to the house to work with J.C., who was two years old at the time but not talking. When he turned three, the grandparents enrolled J.C. in a "special ed[ucation] school." The grandparents applied for TANF and Medicaid benefits for the children and took them to the pediatrician and dentist. After T.C. and K.C. reported the prior sexual abuse, the grandparents arranged for them to receive counseling at a children's advocacy center.

In November 2018, the JDR court entered a final order granting the grandparents legal and physical custody of the children. The parents were awarded supervised visitation at the grandparents' discretion.

Although father filed for custody when initially released from prison, he failed to attend the hearing, and his petition was dismissed. He relapsed on drugs in 2019 and absconded from probation for approximately 11 months. He was incarcerated for 20 months for violating probation, from May 2020 until January 2022.

Father was permitted to visit with the children via telephone while incarcerated, and he attended those calls regularly. After his release, he began in-person visits approximately every other week. Father often brought along his son from another relationship, and the children all interacted well. Father reported that he passed the football with T.C. and the children did not want him to leave at the end of the visits. The grandparents encouraged the visits and thought they were positive experiences. They did not feel the need to supervise constantly and gave father "a little bit of room" to interact and play with his children. The grandmother testified that even if the court granted the adoption petition and terminated father's parental rights, they would still allow him to visit the home.

The grandparents petitioned for adoption in April 2022. At the hearing, father testified that he had been "clean" since his May 2020 incarceration but also admitted that he drank alcohol with his friends. Father was still legally married to mother but lived with his girlfriend and their child; his girlfriend was pregnant with a second child at the time of the hearing. They lived with the girlfriend's parents and her brother. Father testified that the brother would move to the basement so that T.C., K.C., and J.C. could occupy two bedrooms upstairs. Father admitted, however, that this living arrangement "would not be ready for them today" because he "would have to get [the children] . . . beds and dressers and stuff like that."

The record reflects that father had been earning $16 per hour since May 2022, after previously earning $12.50 per hour beginning in March 2022. He paid no child support while the children lived with the grandparents; he occasionally provided money for diapers and milk when J.C. was a baby. He offered to pay for the children to enroll in a basketball program. When asked if he was ready to support the children, he said, "[N]ot at the moment until I get . . . a living situation for them, but financially, yes." At the time of the hearing, father was having income from his paycheck withheld to reimburse the state for TANF benefits awarded to the grandparents.

- 4 -

Grandfather was disabled and cared for the children while grandmother worked. Grandmother changed jobs one month before the adoption hearing to improve her work hours and be able to spend more time with the children. Mother's stepsister testified that the children were "happy and well taken care of" in the grandparents' home and she thought it would "be best" for the children to continue living with them. The court heard testimony from grandmother, grandfather, and mother's stepbrother that any move would negatively affect all three children and that T.C. would have "the hardest time" because he had lived with his grandparents for most of his life. The grandparents agreed that they had "no problem" with father's girlfriend and considered them to be good parents to the child they have together.

After the parties presented their evidence, the court met with all three children in chambers. The court then heard the guardian ad litem's report and recommendation. The guardian ad litem said that although father's home was "adequate," it belonged to his girlfriend's parents, and the terms of his permission to stay there were unclear. The guardian ad litem was unsure whether the house was owned or leased, or whether father paid any rent or "was just living there." The guardian ad litem reported that father interacted appropriately with his girlfriend and their child together. He stated that father "is much improved in his life" but "nonetheless, I have . . . some concerns" about father's stability. Regarding the grandparents' readiness to adopt, the guardian ad litem reported that "everything seems to be in order" and that the grandparents "know[] what these children need at this time and how to provide that for them" and had "done a good job thus far."

The court found that the children had been "unquestionably abandoned" in 2017 but the parents had "attempted and made contact" with the children "within six months prior to the filing of the adoption petition." Accordingly, the parents' consent to adoption was required,[4] or the court

---

[4] Code § 63.2-1202(H) waives the consent requirement when the birth parent "without just cause, has neither visited nor contacted the child for a period of six months immediately prior to the filing of the petition for adoption."

had to find that the parents were withholding consent contrary to the children's best interests under the factors in Code § 63.2-1205.

In its ruling, the court expressly reviewed each of the statutory factors. It concluded, based on all the evidence, that "granting the petition for adoption [was] unquestionably in the best interest of the subject children" and "[n]ot doing so . . . would work a severe detriment to each of these children." The court entered the final adoption order on January 19, 2023.

ANALYSIS

I. Consideration of Factors in Code § 63.2-1205

Father's first five assignments of error challenge the court's finding that he withheld his consent to the adoption contrary to the best interests of the children under Code § 63.2-1205.

Specifically, he contends the court erred in granting the adoption despite finding that he was willing and able to care for the children, had "substantially corrected" the conditions leading to their removal, and was positively engaging with the children. (Assignment of Error 1). He argues the court ignored these findings and instead erroneously concluded that an ongoing relationship with the children would be detrimental to their welfare. (Assignments of Error 2, 4). He also faults the court for not considering that the guardian ad litem "praised [him]" and "did not unequivocally opine in favor of the adoption." (Assignment of Error 3). Finally, father argues that granting the adoption was "against the greater weight of the evidence," including evidence that showed he is "more financially able to care for the children than [the] grandparents." (Assignment of Error 5).

Code § 63.2-1205 is part of the statutory scheme for granting adoptions without parental consent and provides a non-exhaustive list of factors for determining the best interests of the child:

> In determining whether the valid consent of any person whose consent is required is withheld contrary to the best interests of the child, . . . the circuit court . . . shall consider whether granting the petition pending before it would be in the best interest of the child. The circuit court . . . shall consider all relevant factors, including the birth parent(s)' efforts to obtain or maintain legal and physical

custody of the child; whether the birth parent(s) are currently willing and able to assume full custody of the child; whether the birth parent(s)' efforts to assert parental rights were thwarted by other people; the birth parent(s)' ability to care for the child; the age of the child; the quality of any previous relationship between the birth parent(s) and the child and between the birth parent(s) and any other minor children; the duration and suitability of the child's present custodial environment; and the effect of a change of physical custody on the child.

"The weighing of the statutory factors [in Code § 63.2-1205] is, by necessity, fact-specific and highly discretionary. The discretion to make the relevant determinations is vested where the judicial branch comes into the closest contact with the child, the biological parents, and the prospective adoptive parents—the circuit court." *Geouge*, 68 Va. App. at 372. An appellate court "will not second-guess the circuit court's exercise of judgment regarding the statutory factors." *Id.*

The record shows that the court properly considered and evaluated the statutory factors in concluding that father was withholding his consent to the adoption contrary to the best interests of the children. Although father contends the court found that he was "willing and able to care for the children," in fact the court expressly determined that father was not "able to assume full custody" at the time of the hearing due to his lack of stable housing. The evidence supports this finding. Father lived at his girlfriend's parents' house, but without a lease or other clear arrangement. At the hearing, he admitted that he was not ready to take the children because he first needed to move his girlfriend's brother to the basement and purchase bedroom furniture. Father had been out of prison since January 2022, but had taken no steps by the adoption hearing—which occurred in October 2022—to secure adequate housing or prepare a living space for the children.

Additionally, the court found that the birth parents' previous relationships with the children were "tumultuous, neglectful, sporadic, and uneven." The court based this finding on evidence that DSS had removed the two older children in 2016, that the children were victims of father's child

- 7 -

endangerment in 2017, and that they were effectively abandoned by his prolonged incarceration and by mother's act of leaving them with a legal stranger.

Considering the duration and suitability of the children's present custodial environment, the court found that the children had been in continuous court-ordered custody of the grandparents since July 2018, approximately four years and four months. The court determined that the grandparents appeared "physically, emotionally, and financially capable of parenting these children based on an exemplary four plus year record of having done so." The court noted that the children had special needs and had struggled prior to placement with the grandparents, and it found that this placement was a "loving, stable, and positive environment [that] meets the needs of the children." The court concluded that the "present custodial environment is suitable in every regard."

In assessing how a change in physical custody would affect the children at this time, the court first acknowledged that father had a "very good relationship with his girlfriend's child" and "had righted many of the problems that have brought him here today." Nevertheless, the court found that a change in physical custody would "entail serious adverse effects on the children."

On appeal, father emphasizes the progress he made in terms of parental fitness. Indeed, the court noted that father had "substantially corrected" certain conditions leading to the children's removal, had improved his "physical, mental, and financial, and legal condition," and was "positively now engaging with his children." The court expressed hope that "this relationship . . . will continue to progress[] and his sobriety and stability will continue." The court did not proceed to ignore these favorable findings, as father suggests, but instead weighed them against the other factors that reflected negatively on his parental fitness—most significantly, his "tumultuous, neglectful, sporadic, and uneven" prior relationship with the children, which included the extended period of time he was absent from their lives, his lack of stable housing, and his inability to assume full custody immediately.

Finally, although the guardian ad litem gave a short report and recommendation, he did not equivocate on the issue of whether to grant the adoption. He clearly expressed concern about father's parental fitness and did not recommend any alternatives to adoption. Therefore, the court "did not abuse its discretion in considering the report and recommendation of the guardian ad litem and in attributing to it whatever weight the court deemed appropriate." *Wiencko v. Takayama*, 62 Va. App. 217, 234 (2013).

Because the court "reviewed the statutory factors, based its findings on evidence presented, and did not commit legal error," we have "no basis . . . to reverse its decision." *Geouge*, 68 Va. App. at 372.

II. Due Process

In his sixth assignment of error, father argues the court's application of Code § 63.2-1205 infringed on his fundamental right to the upbringing of his children and thus violated the Due Process Clause of the Fourteenth Amendment. He bases this argument on the "absen[ce]" of statutory language "asking whether the [p]arent has participated in major upbringing[] decisions of the children such as signing them up for basketball." Constitutional arguments present questions of law that appellate courts review de novo. *Lively*, 72 Va. App. at 440.

Neither the statute, nor the court's application of it in this case, violated father's due process rights. The Supreme Court of Virginia affirmed the constitutionality of Code § 63.2-1205 in *Copeland v. Todd*, 282 Va. 183, 197-201 (2011). There, the Supreme Court held that although the statutory factors address the best interest of a child, they nevertheless adequately protect the fundamental liberty interests of a biological parent in the "care, custody, and control of their children." *Id.* at 198, 200-01 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion)). "We consistently have held that to grant a petition for adoption over a birth parent's objection, there must be more than a mere finding that the adoption would promote the child's best

interests." *Id.* at 197. The statutory factors in Code § 63.2-1205 "define[] the best interests of the child in terms that require more expansive analysis than when the contest is between two biological parents." *Id.* at 199. Because the factors "focus on *both* the parent and child," the statute "pass[es] constitutional due process scrutiny" by "provid[ing] for consideration of parental fitness and detriment to the child"—despite the fact the statute does not include the phrase "detriment to the child." *Id.*

A similar analysis applies here. Although Code § 63.2-1205 does not expressly refer to a biological parent's fundamental right to raise his or her child, the statute commands an "expansive analysis" of both a parent's fitness and the child's welfare. *Id.* This expansive analysis adequately protects the liberty interests of the biological parent, including father's claimed interest in raising his children. *See id.* at 199-200; *see also Troxel*, 530 U.S. at 65. Furthermore, here, the record is clear that in applying the factors, the court did not just evaluate the children's best interests in a vacuum; it considered the totality of father's circumstances, including his criminal history, lack of stability, and inability to assume immediate custody. The court did not ignore father's fundamental right to the upbringing of his children but instead determined that, under the circumstances of this case, he had forfeited that right and was withholding consent to the adoption contrary to the children's best interests.

An adoption order over a parent's objection pursuant to Code § 63.2-1205 survives "constitutional due process scrutiny because [the statutory requirements] encompass far more than mere consideration of the child's best interests as defined in cases involving a contest between natural parents." *Copeland*, 282 Va. at 200. Although we recognize that the "'interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests,'" as long as a court "properly considered the statutory factors, we can reverse its conclusions only if they are beyond the pale of reasonableness." *Geouge*, 68 Va. App. at 368, 371

- 10 -

(alteration in original) (quoting *Troxel*, 530 U.S. at 65).  Based on the record before us, we hold that the court did not err in finding that father withheld his consent to the adoption contrary to the best interests of the children under Code § 63.2-1205.

CONCLUSION

We affirm the order granting the grandparents' petition for adoption.

*Affirmed.*