COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Malveaux and Senior Judge Frank
Argued at Newport News, Virginia

PUBLISHED

DENISE HAWKINS

OPINION BY
v.        Record No. 0841-17-1        JUDGE ROBERT J. HUMPHREYS
FEBRUARY 13, 2018

DARLA GRESE

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Steven C. Frucci, Judge

Elizabeth Lynn Littrell (Barbara A. Fuller; Lambda Legal Defense
and Education Fund, Inc.; Fuller, Hadeed & Ros-Planas, PLCC, on
briefs), for appellant.

Brandon H. Zeigler (Allison W. Anders; Parks Zeigler, PLLC, on
brief), for appellee.

(Margaret V. Weaver; Weaver Law Services, on brief), Guardian
*ad litem* for the minor child.

Denise Hawkins ("Hawkins") appeals the custody determination of the Virginia Beach

Circuit Court ("circuit court") awarding full custody of B.G. to his biological mother Darla Grese

("Grese").

I.  BACKGROUND

Hawkins and Grese were unmarried partners in a ten-year, same-sex relationship.  During

this relationship they discussed having a child.  Grese became pregnant via artificial

insemination and gave birth to B.G. in 2007.  The parties never married or formed a civil union

in another state[1] nor did Hawkins ever adopt B.G.  Nevertheless, B.G. was raised by Hawkins

_____

[1] Same-sex marriages were not legal in the Commonwealth until 2014 following the
decision of the United States Court of Appeals for the Fourth Circuit in Bostic v. Schaefer, 760
F.3d 352 (4th Cir. 2014).

and Grese in their shared home until they ended their relationship in 2014. The parties informally shared custody of B.G. from that point for a further two years. Eventually, relations between Grese and Hawkins soured and Grese terminated B.G.'s contact with Hawkins.

On February 24, 2016, Hawkins filed a petition for custody and visitation of B.G. in the Juvenile and Domestic Relations District Court ("JDR court") for the City of Virginia Beach. The JDR court awarded joint legal and physical custody to Hawkins and Grese as well as shared visitation, finding that B.G. considered both women to be his parents. The JDR court further found that B.G. was developing behavioral problems based on his separation from Hawkins, and two psychologists, as well as the guardian *ad litem*, testified that removing either Hawkins or Grese from B.G.'s life would cause emotional and psychological harm.

Grese appealed the JDR court's decision to the Circuit Court of the City of Virginia Beach ("circuit court"). She initially appealed both the custody and visitation awards, but subsequently withdrew the visitation appeal. Addressing the remaining custody issue, the circuit court first determined that Hawkins could not be considered a parent based on Virginia's rejection of the de facto parent doctrine. It further held that Hawkins, as a non-parent, interested party, did not rebut the parental presumption in favor of Grese's custody of B.G. The circuit court couched these decisions in language that clearly showed grave concern that separation from Hawkins would cause B.G. continued harm but the circuit court concluded that the law of the Commonwealth left it little option. Hawkins now appeals the circuit court's decision, alleging that the circuit court erred in determining she was not a parent to B.G., that the circuit court violated her constitutional parental rights, violated B.G.'s constitutional rights, and finally, erred in finding she had not rebutted the parental custody presumption.

## II.  ANALYSIS

### A.  Standard of Review

"Where, as here, a court hears evidence *ore tenus*, its findings are entitled to the weight of a jury verdict, and they will not be disturbed on appeal unless plainly wrong or without evidence to support them."  Gray v. Gray, 228 Va. 696, 699, 324 S.E.2d 677, 679 (1985). Further, "the appellate court should view the facts in the light most favorable to the party prevailing before the trial court."  Bottoms v. Bottoms, 249 Va. 410, 414, 457 S.E.2d 102, 105 (1995).

### B.  The Constitutional Standard to be Applied

Hawkins points to the landmark Supreme Court decision in Obergefell v. Hodges, 135 S. Ct. 2584 (2015), and its progeny, including Pavan v. Smith, 137 S. Ct. 2075 (2017), to support her contention that "non-biological parents in planned families comprising same-sex couples and their children are in fact *parents*."  Hawkins argues that by refusing to so hold, the circuit court has violated the liberty and equality guaranteed her by the Fourteenth Amendment.

Hawkins' arguments regarding the manner in which her constitutional rights were allegedly violated are a bit convoluted.  Hawkins asserts that

> By declining to recognize [Hawkins'] status as a parent and perform a best interest determination, the Trial Court violated the liberty and equality guarantees of the Fourteenth Amendment. First, the Trial Court impermissibly infringed upon [Hawkins'] fundamental liberty interest in parental autonomy.  Second, the Trial Court impermissibly imposed a barrier to former members of same-sex couples seeking recognition of their parent-child relationships that does not exist for members of different-sex couples, and thereby discriminated with respect to the exercise of a fundamental right.

In other words, Hawkins apparently alleges that it is the circuit court's action itself, rather than the law of the Commonwealth it relied on, that is unconstitutional.  While this is less common than challenging the constitutionality of a statute or regulation, it is certainly a

legitimate argument, as the judiciary is considered a state actor for Fourteenth Amendment purposes.[2]  However, it also narrows the focus of our analysis of these assignments of error.

The United States Supreme Court in United States v. Carolene Prods. Co., 304 U.S. 144 (1938), introduced the concept that challenges to constitutionality of a statute or a state action should be judged under a tiered review system, with "narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution."  Id. at 152 n.4.  This footnote has evolved into the modern three-tiered constitutional review standard in which by default the laxest standard, rational basis review, applies.  The highest standard, strict scrutiny, applies where "[w]here certain 'fundamental rights'" are involved, and requires that legislation or actions "limiting these rights may be justified only by a 'compelling state interest,'" requiring legislation and action "must be narrowly drawn to express only the legitimate state interests at stake."  Roe v. Wade, 410 U.S. 113, 155 (1973).  Such fundamental rights include not only those listed in the Bill of Rights but additional implied rights protected by the Fourteenth Amendment.

Sexual orientation has not been characterized as a suspect or quasi-suspect classification deserving of strict scrutiny by the United States Supreme Court.  Instead, the Court has chosen to rely on the rational basis test or to simply omit discussion of the proper standard when confronted with issues of homosexual rights.  Romer v. Evans, 517 U.S. 620 (1996), overturned a Colorado constitutional amendment aimed at homosexuals using the rational basis test.

---

[2] E.g., "Although, in construing the terms of the Fourteenth Amendment, differences have from time to time been expressed as to whether particular types of state action may be said to offend the Amendment's prohibitory provisions, it has never been suggested that state court action is immunized from the operation of those provisions simply because the act is that of the judicial branch of the state government."  Shelley v. Kraemer, 334 U.S. 1, 18 (1948).  More relevantly, in Palmore v. Sidoti, 466 U.S. 429 (1984), the Supreme Court overturned a Florida custody order using the strict scrutiny test, the highest tier of review, because it had been based on racial considerations.

Lawrence v. Texas, 539 U.S. 558 (2003), overturned Bowers v. Hardwick, 478 U.S. 186 (1986), and invalidated a Texas anti-sodomy law on the grounds that Bowers had too narrowly characterized the behavior at issue as "whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy." Lawrence, 539 U.S. at 566. Instead, the Lawrence Court apparently re-characterized the issue as derivative of the fundamental right to privacy but did not articulate a standard of review for invalidating the law. Id. at 578. In her concurrence, Justice O'Connor suggested rational basis grounds for the Court's decision. Id. at 579-85. Though the legal history on this point is confusing, presently it appears that sexual orientation based classifications are subject to rational basis review.

Turning to parental rights, the United States Supreme Court has held that the liberty guaranteed by the Fourteenth Amendment encompasses "not merely freedom from bodily restraint but also . . . to marry, establish a home and bring up children." Meyer v. Nebraska, 262 U.S. 390, 399 (1923). However, the principal cases addressing this right of child rearing, Meyer and Pierce v. Society of Sisters, 268 U.S. 510 (1925), predate the adoption of the modern tiered system of constitutional application. Wisconsin v. Yoder, 406 U.S. 205 (1972), later addressed this right but did so in tandem with religious concerns. As such, the United States Supreme Court has not stated clearly what level of scrutiny applies in addressing parental rights. See generally, Troxel v. Granville, 530 U.S. 57 (2000). However, this Court has held that "the parents' right to autonomy in child rearing is a fundamental right protected by the Fourteenth Amendment of the United States Constitution and that state interference with that right must be justified by a compelling state interest." Williams v. Williams, 24 Va. App. 778, 780, 485 S.E.2d 651, 652 (1997), modified and aff'd on appeal, 256 Va. 19, 501 S.E.2d 417 (1998). Hawkins, however, is seeking an initial determination that she is a parent and thus has at least an equal right to the custody of B.G. as Grese, B.G.'s biological parent. Therefore, whether the

issue is that Hawkins' rights were violated because she is a lesbian or because the circuit court determined that she is not a parent, we conclude that the rational basis test applies in either case to the constitutionality of the circuit court's judgment.

Under the rational basis test, "[t]he general rule is that legislation [or, in this case, judicial action] is presumed to be valid and will be sustained if the classification drawn by the [circuit court] is rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985). This standard is used to "determin[e] the validity of state legislation or *other official action* that is challenged as denying equal protection." Id. (emphasis added). This test applies equally to the liberty guarantees of the Fourteenth Amendment. Thus, with the rational basis test in mind, we return to Hawkins' assignments of error.

## C. Whether Hawkins is a Parent to B.G.

All but one of Hawkins' assignments of error rely on the foundational assertion that she is B.G.'s parent, and thus we begin by examining this underlying contention. In essence, she claims that the circuit court violated her constitutional rights as a parent by holding that she was not a parent. This begs two questions: How is a parent defined for statutory purposes; and is that definition constitutional?

Turning first to the statutory definition of parentage, the laws of the Commonwealth do not expressly define the term "parent" in the context of custody. Nevertheless, by looking to other areas within the Code of Virginia where parent is used, it is clear that the term "parent" contemplates a relationship to a child based upon either the contribution of genetic material through biological insemination or by means of legal adoption. For example, the Code provides that parentage may be established by "scientifically reliable genetic tests," "[a] voluntary written statement of the father and mother made under oath acknowledging paternity," or "proof of lawful adoption." Code § 20-49.1. In the case of children that are the result of assisted

conception such as B.G., the law is clear that Grese, but not Hawkins, is a parent of B.G.[3]

Further, the most germane section of the Code, dealing with custody and visitation, defines

"person with a legitimate interest"—as a party *other than a parent* who may seek custody and

visitation—as including but not limited to "grandparents, step-grandparents, stepparents, former

stepparents, blood relatives and family members."  Code § 20-124.1.  If such "person[s] with a

legitimate interest" are in contention with parents for custody they cannot simultaneously also be

parents.  It seems clear, and we hold that where custody disputes are concerned, the term

"parent" is a relationship to a child only through either biological procreation or legal adoption.

This definition of a parent was implicitly employed by the circuit court in this case and is

also consistent with the Commonwealth's refusal to adopt wider parental definitions through

other legal constructions such as the de facto or psychological parent doctrines adopted by some

of our sister states and urged on us by Hawkins.[4]  In fact, the case relied upon by the circuit court

expressly rejecting the de facto parent doctrine in Virginia, <u>Stadter v. Siperko</u>, 52 Va. App. 81,

---

[3] Code § 20-158(A) in pertinent part provides that

> the parentage of any child resulting from the performance of
> assisted conception shall be determined as follows:
>
> 1.  The gestational mother of a child is the child's mother.
>
> 2.  The husband of the gestational mother of a child is the child's
> father, notwithstanding any declaration of invalidity or annulment
> of the marriage obtained after the performance of assisted
> conception, unless he commences an action in which the mother
> and child are parties within two years after he discovers or, in the
> exercise of due diligence, reasonably should have discovered the
> child's birth and in which it is determined that he did not consent
> to the performance of assisted conception.

[4] <u>See, e.g.</u>, <u>Conover v. Conover</u>, 141 A.3d 31 (Md. 2016) (adopting de facto parent status
in Maryland in a same-sex custody dispute); <u>Ramey v. Sutton</u>, 362 P.3d 217, 220-21
(Okla. 2015) ("The [same-sex] couple's failure to marry cannot now be used as a means to
further deprive the nonbiological parent, who has acted *in loco parentis*, of a best interests of the
child hearing.").

661 S.E.2d 494 (2008), is factually similar to this one. In Stadter a woman sought visitation with her ex-partner's biological child after the end of their same-sex relationship. She asked the court to treat her as a parent under the de facto parent doctrine. This Court noted that the de facto parent doctrine was simply being urged as a tool for overcoming a constitutional presumption in favor of parents in custody disputes. Id. at 90-91, 661 S.E.2d at 498. We pointed out that such a tool already exists in Virginia—the "person with a legitimate interest" classification of Code § 20-124.1. Id. at 91-92, 661 S.E.2d at 499.

In sum, the Commonwealth uses a definition of parent tied to blood or adoption, while also providing a method for parties without these ties, but with similarly close relationships, to intervene as "persons with a legitimate interest" under some circumstances.

We now must consider whether this definition of parentage passes the rational basis test for constitutionality. Hawkins argues that Obergefell and its progeny have implicitly redefined "parent" or "family" in a manner that obviates the Commonwealth's definition and mandates a holding that, because her relationship with Grese was the functional equivalent of marriage, her relationship with B.G. was constitutionally a parent-child relationship.

We disagree with Hawkins on this point. The Commonwealth's definition of "parent" is not inconsistent with United States Supreme Court jurisprudence regarding the nature of the family and parentage. "[T]he usual understanding of 'family' implies biological relationships, and most decisions treating the relation between parent and child have stressed this element." Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 843 (1977). When the state defers to the family, it is with the recognition that "the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children, . . . *as well as from the fact of blood relationship*." Id. at 844

- 8 -

(emphasis added) (internal citations omitted). There is no "serious[] dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship," but natural, biological parentage is a unique relationship predating any legal arrangement. Id. A judicial expansion of the term "parent" to include someone not bound by blood or law would be a legal construct which, rather than greatly predating the bill of rights, would be "an arrangement in which the State has been a partner from the outset." Id. at 845.

Further, this definition of parentage does not discriminate between same-sex and opposite-sex couples. If the couple is not married, the non-biological/non-adoptive partner is not a parent irrespective of gender or sexual orientation. It is true that when Hawkins and Grese began their relationship, the law of the Commonwealth barred Hawkins and Grese from marrying, but the record does not indicate this was the sole reason they remained unmarried. While those laws previously banning same-sex *marriage* were discriminatory, the Commonwealth's definition of parent is not as it applies equally regardless of an unmarried couple's gender or sexual orientation.

In applying the rational basis test, the United States Supreme Court has noted that "[a]ll laws classify, and, unremarkably, the characteristics that distinguish the classes so created have been judged relevant by the legislators responsible for the enactment." Toll v. Moreno, 458 U.S. 1, 39 (1982). Here, the law classifies as parent and non-parent through the circuit court's application of the definition discussed above.

In a rational basis analysis, "our judicial function permits us to ask only whether the judgment of relevance made by the [circuit court] is rational." Id. The relevant characteristics which classify here are entirely rational—people are considered parents on either biological or adoptive grounds, parties without these qualities retain a fair legal method to intervene if a parent

is unfit.  Further, "[a] classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'"  Heller v. Doe, 509 U.S. 312, 321 (1993) (quoting Dandridge v. Williams, 397 U.S. 471, 485 (1970)).  Though Hawkins undoubtedly has a close relationship with B.G. and is in a sympathetic and difficult position, the circuit court did not violate her constitutional rights by declining to recognize her as a parent of B.G.

In Obergefell, the Supreme Court held only that same-sex *marriage* was a constitutionally protected right.  The majority's analysis in Obergefell is ordered around four principles which, according to the Court, demonstrate why constitutional marriage guarantees must apply with equal force to same-sex couples.  These principles do indeed stress that confusion surrounding the status of children of same-sex couples is a source of social instability and suffering, stating that the right to marriage "safeguards children and families and thus draws meaning from related rights of childrearing, procreation, and education."  Obergefell, 135 S. Ct. at 2600.  Further, the Court described these rights as a "unified whole," identifying the conglomerate right to "'marry, establish a home and bring up children'" as "'a central part of the liberty protected by the Due Process Clause.'"  Id. (quoting Zablocki v. Redhail, 434 U.S. 374, 384 (1978)).  More starkly, the Court stated that "[t]he marriage laws at issue here . . . harm and humiliate the children of same-sex couples."  Id. at 2600-01.  Pavan relied on Obergefell to overturn an Arkansas law which required the father of a child to be listed on that child's birth certificate.  The consolidated appellants in Pavan were two legally married lesbian couples.  As with B.G., the fathers were anonymous sperm donors.  The law was invalidated because it infringed "the constellation of benefits that the States have linked to marriage."  Pavan, 137 S. Ct. at 2077 (quoting Obergefell, 135 S. Ct. at 2601).  In sum, the entire basis of the holding of Obergefell is the significance and importance of *marriage* as an institution that should not be

- 10 -

withheld from same-sex couples. Barring procreation or adoption, pre-Obergefell, different-sex marriages did not automatically result in the spouses becoming legal parents of each other's children and the analysis of the Obergefell majority opinion does not compel a different conclusion with respect to same-sex marriages, far less unmarried couples of any sexual orientation.

Hawkins suggests that the "special facts and circumstances," of this case provide an avenue for carving out an exception in this admittedly exceptional case. However, were we to do so, it is clear to us that the constitutional presumption of parental fitness would begin the process of suffering a death by a thousand cuts.

We certainly acknowledge that society has evolved new family structures while simultaneously concluding that qualitatively and quantitatively assessing which among a kaleidoscope of those structures should be given legal recognition is more properly the province of the people's representatives in the General Assembly rather than the courts and Obergefell does not require a different conclusion.[5] Were we to adopt the "know it when we see it," "special circumstances" definition of parentage urged on us by Hawkins, it would open a Pandora's box of unintended consequences to hold that a legal parent-child relationship is created simply by virtue of such factors as the amount of time a child spends with, or the strength of an emotional bond that exists between, another living in the same household. It is not hard to imagine profound consequences for society and the courts if a parent knows that an ex-wife, ex-husband, ex-boyfriend, ex-girlfriend, former nanny, au pair or indeed virtually anyone not

---

[5] The current definition of "parent" that we hold in this case represents the intent of the General Assembly for use in custody cases, may well require that one or both spouses in a same-sex marriage formally adopt any children intended to become part of the family unit but the process of legal adoption provides a mechanism and forum for the rights of all the parties in interest to be considered.

related to their child through biology or legal adoption, can be placed on equal footing as a biological or adoptive parent solely through a significant emotional bond with the child.

Much of the Obergefell language Hawkins cites is aspirational, seeking normality for same-sex families. It would be ironic for us to hold that the very decision expressing these aspirations became a tool for the erosion of the object of its aspiration—a family structure based upon marriage. The logical fallacy of this approach is apparent as well, if restricting marriage to opposite sex couples was unconstitutional because it denied same-sex couples the "constellation of benefits" heterosexual couples received, it could not possibly also then require the redefinition of every star in that constellation.

More fundamentally, Hawkins did not adopt B.G. during her relationship with Grese and thus relies upon her construction of Obergefell for relief. However, Obergefell provides no help for Hawkins because she and Grese were never married. Hawkins does not expressly ask us to recognize a formal "marriage" to Grese, but her reliance on Obergefell implies that we should retroactively construct an informal one. Our Supreme Court has recently held that ceremonial intent trumps legalistic form in marital matters and that solemnization is the *sine qua non* of any marriage, which need not coincide with the formal licensing of the union by the Commonwealth. See Levick v. MacDougall, 294 Va. 283, 805 S.E.2d 775 (2017). Even given this wide latitude, there is no marriage here. Hawkins concedes that the parties made no attempt to marry. Whatever a "solemnization" of marriage may be, it is not present in this record. That Hawkins and Grese were legally forbidden to marry in the Commonwealth at the time they began their relationship does not establish that they would have exercised the option if it were available. Moreover, currently, for civil matters, the general rule of retroactivity for Supreme Court precedent holds that

> [w]hen this Court applies a rule of federal law to the parties before
> it, that rule is the controlling interpretation of federal law and must

> be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.

Harper v. Va. Dep't of Taxation, 509 U.S. 86, 97 (1993).

How retroactivity applies to the "constellation of rights" discovered in Obergefell is a question which has not yet been answered, nevertheless, this principle of retroactivity does not license this Court to engage in forensic retrospective marriage construction. For all of these reasons, Hawkins is not a parent to B.G. and the circuit court did not err in reaching that conclusion. Therefore, we need not further consider Hawkins' assignments of error dependent upon that status.

### D.  Hawkins' Standing to Assert B.G.'s Constitutional Rights

The final constitutional concern Hawkins raises are B.G.'s constitutional rights to association with Hawkins. Hawkins argues that the circuit court wrongly denied her third party (*jus tertii*) standing to assert B.G.'s constitutional right to association with her. Hawkins claims that B.G. has a constitutional right "to be raised and nurtured by [his] parents," meaning herself, and attempts to assert that right on his behalf. D.B. v. Cardall, 826 F.3d 721, 740 (4th Cir. 2016) (quoting Berman v. Young, 291 F.3d 976, 983 (7th Cir. 2002)).

The Supreme Court of the United States has divided standing issues into two categories, Article III Standing and Prudential Standing. The former restricts federal jurisdiction to "cases" and "controversies." U.S. Const. art. III, § 2, cl 1. While the latter traditionally encompasses third party standing as well as other areas where the Court has restrained itself through "'judicially self-imposed limits on the exercise of federal jurisdiction.'" Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11-12 (2004).

Further, the Supreme Court has recently signaled doubt on whether third party standing doctrine is rightly considered prudential, noting that, though most cases address it as such, "[t]he

limitations on third-party standing are harder to classify" and that it might be more suited to an Article III case and controversy analysis.  See Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1387 n.3 (2014).

However, "under our federal system, the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." Tafflin v. Levitt, 493 U.S. 455, 458 (1990).  This concurrent sovereignty has led the United States Supreme Court to "recognize[] often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability even when they address issues of federal law, as when they are called upon to interpret the Constitution or, in this case, a federal statute." ASARCO, Inc. v. Kadish, 490 U.S. 605, 617 (1989) (citations omitted).  This includes federal standing rules. "Although the state courts are not bound to adhere to federal standing requirements, they possess the authority, absent a provision for exclusive federal jurisdiction, to render binding judicial decisions that rest on their own interpretations of federal law." Id.  This means that the federal standing grounds which Hawkins and Grese argue while persuasive, are not binding on this Court.  Neither party has addressed the Commonwealth's standing requirements in their argument.

The Commonwealth's third party standing exceptions are much narrower than those found in the federal system.  In the Commonwealth, unless a statute provides otherwise,[6] the general rule with respect to third party standing is quite straightforward:  "[An individual] may challenge the constitutionality of a law only as it applies to him or her." See Coleman v. City of Richmond, 5 Va. App. 459, 463, 364 S.E.2d 239, 241 (citation omitted), reh'g denied, 6

---

[6] See e.g. Yokshas v. Bristol City Dep't of Soc. Servs., No. 0065-17-3, 2017 Va. App. LEXIS 286 (Va. Ct. App. Nov. 14, 2017).

Va. App. 296, 368 S.E.2d 298 (1988). "That the statute may apply unconstitutionally to another is irrelevant; one cannot raise third party rights." Id. at 463, 364 S.E.2d at 242. See also Pedersen v. Richmond, 219 Va. 1061, 1066, 254 S.E.2d 95, 99 (1979) (finding one lacks standing to assert the privacy rights of third parties). "Simply put, one cannot raise third party rights. Exceptions to the standing rule only apply to certain challenges under the First Amendment, and where individuals not parties to a particular suit stand to lose by its outcome and yet have no effective avenue of preserving their rights themselves." Tackett v. Arlington County Dep't of Human Servs., 62 Va. App. 296, 325, 746 S.E.2d 509, 523 (2013) (internal quotations omitted).

With respect to whether this latter exception should apply to B.G., we examine the requirements of federal prudential third party standing for its persuasive impact on this Court. Under federal precedent, an exception to the general bar on third party standing requires that the party seeking standing must show that they themselves have suffered an injury and then further demonstrate both "a 'close' relationship with the person who possesses the right" and "a 'hindrance' to the possessor's ability to protect his own interests." Kowalski v. Tesmer, 543 U.S. 125, 130 (2004). While the United States Supreme Court has "been quite forgiving with these criteria in certain circumstances," namely in cases involving the First Amendment and where "enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights," id. (quoting Warth v. Seldin, 422 U.S. 490, 510 (1975)), "[b]eyond these examples . . . [the Supreme Court has] not looked favorably upon third-party standing," id.

By contrast, the United States Supreme Court has repeatedly demonstrated its reluctance to interfere with the rights of parents to represent the interests of their children unless absolutely necessary, having recognized that the "primary role of the parents in the upbringing of their

- 15 -

children is now established beyond debate as an enduring American tradition." Yoder, 406 U.S. at 232. Though this parental power is not absolute as against the state, it may only be contravened in rare cases where "it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." Id. at 233-34. Many of these contraventions have occurred in medical scenarios. See, e.g., Planned Parenthood v. Danforth, 428 U.S. 52, 74-75 (1976) (invalidating statutory requirement for parental consent to minor's abortion as challenged by abortion providers). However, even in the medical context, "[s]imply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." Parham v. J.R., 442 U.S. 584, 603 (1979). There are no First Amendment implications for B.G. here nor is Hawkins a doctor or medical provider seeking to preserve B.G.'s health or safety on an emergency basis.

Even with respect to parents, the third party standing issue in such a situation is less than clear. In Elk Grove an atheist father sought third party standing to prevent his daughter's school from forcing her to recite the pledge of allegiance daily. The child's mother sought to intervene as the child's custody was governed by a court order granting her sole control over the child's health, education, and welfare. The father contended that, despite this order, he retained a constitutional right to control his child's education. See Elk Grove, 542 U.S. at 15. The Court held that the father's rights, "as in many cases touching upon family relations, cannot be viewed in isolation." Id. The father's claimed standing was entirely based on third party standing which the Court refused to grant because, "the interests of this parent and this child are not parallel and, indeed, are potentially in conflict." Id. The Court recognized that the question of parental constitutional standing must follow the state law determination of parental status. Id. at 15-16. The present case is no different. Hawkins is not a parent under the law of the Commonwealth

and therefore does not attain *jus tertii* standing to assert B.G.'s constitutional rights where the court has determined Grese is not an unfit parent and has custody of B.G.

Finally, we note B.G is not without an "effective avenue of preserving [his] rights." The Commonwealth provides alternative avenues for protecting a minor third party's legal interests. First, the law provides for a guardian *ad litem*, as was appointed in this case, whose role "is to rise above the fray of the contending parties to ensure that the interests of persons under a legal disability are 'represented and protected.'" Wiencko v. Takayama, 62 Va. App. 217, 233, 745 S.E.2d 168, 176 (2013) (quoting Code § 8.01-9). Hawkins does not assign error to the manner in which the guardian *ad litem* exercised her statutory responsibilities toward B.G. in this case. Second, the "person with a legitimate interest" provisions of Code § 20-124.1, discussed in detail below, as we noted in Stadter, are sufficient to protect the rights of minor third parties. See Stadter, 52 Va. App. at 91-92, 661 S.E.2d at 499.

### E. Whether Special Facts and Circumstances Rebut the Presumption in Favor of Custody with a Biological Parent.

Although Hawkins is not B.G.'s parent, all parties concede and the circuit court found that she is a "person with a legitimate interest" as defined by Code § 20-124.1. This term is to be broadly construed in the best interests of the child and includes non-blood relatives. See Code § 20-124.1. In any child *custody* dispute, "the best interests of the child are paramount and form the lodestar for the guidance of the court in determining the dispute." Walker v. Brooks, 203 Va. 417, 421, 124 S.E.2d 195, 198 (1962). However, "as between a natural parent and a third party, the rights of the parent are, if at all possible, to be respected." Id. This presumption favoring the parent is a strong one, and can only be rebutted by establishing certain factors by clear and convincing evidence, including "(1) parental unfitness . . . ; (2) a previous order of divestiture, . . . ; (3) voluntary relinquishment, . . . ; and (4) abandonment, . . . [and (5)] . . . a finding of 'special facts and circumstances . . . constituting an extraordinary reason for taking a child from

its parent, or parents.'" Bailes v. Sours, 231 Va. 96, 100, 340 S.E.2d 824, 827 (1986) (quoting Wilkerson v. Wilkerson, 214 Va. 395, 397-98, 200 S.E.2d 581, 583 (1973)) (internal citations omitted). "Once the presumption favoring parental custody has been rebutted, the natural parent who seeks to regain custody must bear the burden of proving that custody with him is in the child's best interests." Florio v. Clark, 277 Va. 566, 571, 674 S.E.2d 845, 847 (2009). This subsequent best interest determination is made by the preponderance of the evidence. See Walker v. Fagg, 11 Va. App. 581, 586, 400 S.E.2d 208, 211 (1991).

Hawkins claims that the circuit court erred as a matter of law in finding that she did not demonstrate special facts and circumstances sufficient to rebut the presumption in favor of Grese, thereby justifying a best interest determination by the court. She argues that the circuit court's findings that Hawkins and Grese intended to create a family, that Hawkins and B.G. share a parent-child bond, and that B.G. would be harmed if that bond was severed are sufficient evidence to overcome the presumption in favor of Grese. She notes that in Bailes, where a stepmother was awarded custody instead of a biological mother, the court predicated its award on "the likelihood of inflicting serious harm." Bailes, 231 Va. at 101, 340 S.E.2d at 827. Ergo, she reasons that since the court recognized that B.G. would be harmed by severing his bond with Hawkins, she is entitled to custody of B.G. as a matter of law. The problem with Hawkins' argument is that the special facts and circumstances required by Bailes must be such as to "constitut[e] an extraordinary reason for taking a child from its parent . . . ." Id.

In Bailes, the court found the biological mother was a virtual stranger to her son, who had only visited with him "eight or ten times" over a nine-year period despite having visitation rights. Id. at 98, 340 S.E.2d at 826. Under these extreme circumstances, the Court found that stripping the child from the only mother he had ever known rendered "the presumption favoring the mother . . . repugnant to the child's best interest." Id. at 101, 340 S.E.2d at 827-28. The same

cannot be said of Grese, who has remained a consistent parental presence in B.G.'s life. Given that B.G. would benefit from a continuing relationship with Hawkins, that alone does not rebut the presumption that Grese is a fit mother capable of making child rearing decisions for B.G.

Further, Hawkins alleges the psychological evidence shows that harm will necessarily flow from the severance of the relationship between herself and B.G., but such severance is not a necessary outcome of this dispute. Hawkins also cites O'Rourke v. Vuturo, 49 Va. App. 139, 638 S.E.2d 124 (2006), for her premise. In that case the non-biological father was awarded *visitation* rights, not *custody*.[7] Id. at 146, 638 S.E.2d at 127. Thus, the standard required that "a court must find an actual harm to the child's health or welfare without such visitation." Id. at 148, 638 S.E.2d at 128 (quoting Williams, 256 Va. at 22, 501 S.E.2d at 418).

The JDR court awarded Hawkins visitation with B.G., and Grese withdrew her appeal on this issue. If a new visitation dispute is forthcoming, that proceeding will take place under the more favorable standard discussed in O'Rourke. The guardian *ad litem* argues on brief that the established emotional bond between Hawkins and B.G. is more appropriately a relevant factor supporting "special facts and circumstances" with respect to appropriate *visitation* of B.G. with Hawkins but that issue is not currently before us and we offer no opinion on that point.

Finally, in what amounts to a "catch-all" argument, Hawkins asserts that the recent judicial changes regarding same-sex marriage embodied in Obergefell are, themselves, sufficient evidence to warrant ignoring the Bailes factors and moving straight to a best interest determination. Her arguments regarding the scope of Obergefell are addressed above, but, to reiterate, we do not read Obergefell as mandating the wholesale rewriting of the

---

[7] Visitation does not consider the Bailes factors but does include a best interest determination. The visitation standard requires that a court must find "an actual harm to the child's health or welfare without such visitation" before reaching a best interest determination. Williams, 24 Va. App. at 785, 485 S.E.2d at 654.

Commonwealth's domestic relations statutes. A redefinition of marriage does not render the Bailes factors a nullity.

### III. CONCLUSION

Taking the evidence in the light most favorable to Grese, the prevailing party below, the circuit court's judgment that Hawkins was not a parent of B.G and that the evidence presented by Hawkins was insufficient to rebut the parental presumption in favor of custody of B.G. by Grese is not plainly wrong and therefore should not be overturned. For these reasons, the judgment of the circuit court is affirmed.

<u>Affirmed.</u>