COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:  Chief Judge Decker, Judges Beales and Fulton
Argued by videoconference


MICHAEL HERBERT JESSEE

v.      Record No. 0349-21-2

MICHELLE EVORA JESSEE, N/K/A
 MICHELLE EVORA GRIFFIN

OPINION BY
CHIEF JUDGE MARLA GRAFF DECKER
DECEMBER 14, 2021

FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Claude V. Worrell, Jr., Judge

Norman A. Thomas (Norman A. Thomas, PLLC, on briefs), for
appellant.

James J. O'Keeffe IV (J. Kyle Farmer; MichieHamlett, PLLC, on
brief), for appellee.


Michael Herbert Jessee (the husband) appeals the circuit court's equitable distribution

award of a preserved pre-embryo to Michelle Evora Jessee (the wife).[1]  The husband argues that

the circuit court abused its discretion by awarding the pre-embryo to the wife without applying

the appropriate legal framework.  He also contends that the court erred by failing to assign any

monetary value to the pre-embryo and provide him a monetary award reflecting his marital share

of the property.  For the reasons that follow, we reverse the judgment of the circuit court and

remand for further proceedings consistent with this opinion.

---

[1] Although the circuit court awarded two pre-embryos to the wife (one viable and one
not), the husband specifically contests only the award of the viable pre-embryo.  Therefore, this
opinion refers to the singular contested pre-embryo.

## I. BACKGROUND[2]

The parties married in 2017. They tried to conceive a baby naturally for six months without success and then employed medical intervention to aid in the process. Using *in vitro* fertilization (IVF) and the biological material of both parties, a clinic facilitated fertilization of three eggs, referred to as pre-embryos.[3] The process cost the parties around $20,000. Of the three resulting pre-embryos, two were viable and one was not.

One pre-embryo was transferred to the wife's uterus, but the resulting pregnancy ended in miscarriage. The wife was distraught, and the parties planned to transfer the remaining viable pre-embryo in an effort for her to become pregnant. Ultimately, however, the parties did not do so. Instead, the relationship deteriorated, and the husband filed for divorce in 2020.

In his complaint for divorce, the husband asked the circuit court to award the cryopreserved viable pre-embryo to him. Once awarded to him, the husband intended to have the clinic at which it was stored destroy it. He testified that regardless of the lack of a legal obligation to support any child resulting from the wife's decision to transfer the remaining viable

---

[2] In accordance with familiar principles of appellate review, we review the facts in the light most favorable to the wife, as the prevailing party below. See Armstrong v. Armstrong, 71 Va. App. 97, 102 (2019).

[3] The wife explained that the lab removed her eggs and fertilized them with the husband's sperm. As reflected in the record, after a pre-embryo develops, it may be transferred to the uterine cavity. At that stage, not all pre-embryos will implant and attach to the uterine lining. "Pre-embryo is a medically accurate term for a zygote or fertilized egg that has not been implanted in a uterus." Bilbao v. Goodwin, 217 A.3d 977, 980 n.1 (Conn. 2019) (quoting McQueen v. Gadberry, 507 S.W.3d 127, 134 n.4 (Mo. Ct. App. 2016)). Although "[a]n embryo proper develops only after implantation," the legal literature typically uses the term "frozen embryos" as "a term of art denoting cryogenically preserved pre-embryos." Id. (quoting McQueen, 507 S.W.3d at 134 n.4).

pre-embryo, he worried about the emotional and psychological implications of having a genetic child.[4] He also expressed concern that any child might "come looking for [him] at some point."

The wife wanted to use the viable pre-embryo in an attempt to become pregnant again through assisted reproduction. At forty-three years of age, she believed that due to her decreased fertility and limited finances, it might be her only remaining opportunity to have a biological child. The wife introduced into evidence a report by the Centers for Disease Control and Prevention. According to that report, "fertility in women is known to decline steadily with age." In addition, aging increases a woman's risk of miscarriage and "of having a child with a genetic abnormality."[5] The report further provides that the "success rate" of "assisted reproductive technology" declines with a woman's age. The success rate is 8% in women aged 41 to 42 years and 3% in women aged 43 and older. Although at one point the wife informed the husband that she "would do IVF on [her] own," she testified that she spent that money on "lawyer fees" instead and could not afford to undergo IVF again.

The parties and the circuit court agreed that the pre-embryo was property, albeit of a special nature. The parties argued that due to the uniqueness of the type of property, the disposition of the pre-embryo impacted their constitutional rights. They acknowledged that the circuit court had no binding case law to guide its determination regarding the award of this special property. They discussed the single Virginia opinion on the subject, a circuit court opinion, Patel v. Patel, 99 Va. Cir. 11 (2017), in great detail.

---

[4] Under Virginia law, once a complaint for divorce has been filed, a party to the divorce is not the parent of a child subsequently conceived by the spouse through IVF unless that individual "consents in writing to be a parent." Code § 20-158(C).

[5] According to the report, decreases in female fertility are also associated with smoking and excessive alcohol use. The wife testified that she smoked and occasionally drank alcohol but would quit smoking before continuing with fertility treatments. In addition, she testified that she had a cancerous mass removed from a breast the prior year, but the record contains no evidence of any impact that medical history might have on her fertility.

Ultimately, the circuit court awarded the pre-embryo to the wife.[6] The husband filed a motion to reconsider. In doing so, he asked the court to identify the methodology used in determining the award. The husband requested that the circuit court award him the viable pre-embryo or, alternatively, award him his monetary share of the property. The court explained that it had considered "the equity" of the parties' respective "positions" in making the award. The court also found that the award of the pre-embryo to the wife did not support paying the husband for any marital share of the irreplaceable property because it had no market value and no practical replacement value.

## II. ANALYSIS

The husband appeals the equitable distribution award of the pre-embryo to the wife. In the alternative, he contests the circuit court's decision declining to make a monetary award reflecting his share of the marital property.

At the outset, it is important to note that below, the parties and the circuit court agreed to treat the pre-embryo as a type of property subject to equitable distribution under Code § 20-107.3.[7] See generally McQueen v. Gadberry, 507 S.W.3d 127, 149 (Mo. Ct. App. 2016) (holding that "frozen pre-embryos" are property but "entitled to special respect" due to their potential to develop into "born children"). The parties put the issue squarely before the circuit court and ultimately this Court under that framework. Therefore, we do not address the general applicability of the equitable distribution statute to pre-embryos or whether they constitute property under Virginia law.

---

[6] The equitable distribution determination also awarded the husband $9,481 based on the marital share of certain assets.

[7] Virginia has no statute directly on point. The equitable distribution statute, Code § 20-107.3, encompasses the distribution of property. The statute does not provide a particular framework for distributing preserved genetic material.

On review, a circuit court's "equitable distribution award will not be overturned unless the [appellate court] finds 'an abuse of discretion, misapplication or wrongful application of the equitable distribution statute, or lack of evidence to support the award.'" Anthony v. Skolnick-Lozano, 63 Va. App. 76, 83 (2014) (quoting Wiencko v. Takayama, 62 Va. App. 217, 229-30 (2013)). For those matters raised in this appeal that fall within the circuit court's discretion, this Court cannot determine that an abuse of discretion has occurred unless "reasonable jurists could not differ" on the conclusion that the court erred. See Wynnycky v. Kozel, 71 Va. App. 177, 193 (2019) (quoting Reston Hosp. Ctr. v. Remley, 63 Va. App. 755, 764 (2014)). "Our use of this deferential standard of review 'rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie.'" Id. (quoting Hamad v. Hamad, 61 Va. App. 593, 607 (2013)). "[B]y definition," however, a circuit court "abuses its discretion when it makes an error of law." Coffman v. Commonwealth, 67 Va. App. 163, 166 (2017) (quoting Commonwealth v. Greer, 63 Va. App. 561, 568 (2014)).

An equitable distribution award has both legal and factual components. This Court reviews the circuit court's legal conclusions *de novo.* Dixon v. Dixon, 71 Va. App. 709, 718 (2020). In contrast, an appellate court will not set aside a circuit court's factual findings unless "plainly wrong or without evidence to support [them]." Hughes v. Hughes, 33 Va. App. 141, 146 (2000) (quoting Farley v. Farley, 9 Va. App. 326, 328 (1990)). If credible evidence in the record supports the court's findings, this Court "may not retry the facts or substitute [its] view of the facts" for that of the circuit court. Armstrong v. Armstrong, 71 Va. App. 97, 105 (2019) (quoting Bedell v. Price, 70 Va. App. 497, 504 (2019)). Further, the circuit court, as "the trier of fact[,] ascertains a witness' credibility, determines the weight to be given to [that witness'] testimony, and has the discretion to accept or reject any of the witness' testimony."

Khalid-Schieber v. Hussain, 70 Va. App. 219, 234 (2019) (quoting Street v. Street, 25 Va. App. 380, 387 (1997) (*en banc*)).

The husband argues in part that any award of the pre-embryo to the wife was a *de facto* unconstitutional governmental intrusion on his constitutional right to procreational autonomy because the state did not have a compelling interest at stake. See generally Hawkins v. Grese, 68 Va. App. 462, 471 (2018) (explaining that the Fourteenth Amendment protects individuals from government interference with parental rights absent a compelling state interest). However, in his contract with the wife and the fertility clinic, the husband agreed that in the event of divorce, "the ownership and/or other rights to the embryo(s)" would be "directed by a court decree and/or settlement agreement." Further, in his complaint for divorce, the husband specifically asked the circuit court to distribute the pre-embryo as marital property. After inviting the court to distribute the property, he was then unsatisfied with the disposition and now argues that the circuit court action regarding the pre-embryo was an unconstitutional governmental intrusion. We conclude that the husband cannot complain of undue government interference with his constitutional right after specifically asking the circuit court to intervene.[8] See Rowe v. Commonwealth, 277 Va. 495, 502 (2009) (holding that a party may not complain about an issue on appeal where he "approbate[s] and reprobate[s] by taking successive positions in the course of litigation that are . . . inconsistent . . . or mutually contradictory" (quoting Cangiano v. LSH

---

[8] The husband also contends for the first time on appeal that the circuit court erred by misapplying Code § 20-107.3(E), the equitable distribution statute, by failing to consider any of the factors listed in the statute. However, he did not make this argument below. See Rule 5A:18; Johnson v. Commonwealth, 58 Va. App. 625, 637 (2011) ("Making one specific argument on an issue does not preserve a separate legal point on the same issue for review." (quoting Edwards v. Commonwealth, 41 Va. App. 752, 760 (2003) (*en banc*), aff'd by unpublished order, No. 040019 (Va. Oct. 15, 2004))). Accordingly, this argument is barred pursuant to Rule 5A:18, and we do not consider it on appeal. See Tackett v. Arlington Cnty. Dep't of Human Servs., 62 Va. App. 296, 315 (2013).

Bldg. Co., 271 Va. 171, 181 (2006))); Logan v. Commonwealth, 47 Va. App. 168, 172 n.4 (2005) (*en banc*) (explaining that an appellate court may accept a legal concession as a waiver). See generally Palmyra Assocs., LLC v. Comm'r of Highways, 299 Va. 377, 386-87 (2020) (describing the invited error doctrine).

The husband also contends that the circuit court abused its discretion in awarding the viable pre-embryo to the wife by applying "an incorrect . . . analytical approach." This case presents the first time an appellate court in Virginia has been called upon to resolve a dispute over the award of a preserved pre-embryo.[9] Other states addressing the matter have generally recognized three approaches in determining distribution: contemporaneous mutual consent, contractual, and balancing. Under the contemporaneous mutual consent approach, the pre-embryos must remain in storage until the parties agree to a disposition. Bilbao v. Goodwin, 217 A.3d 977, 985 (Conn. 2019); In re Marriage of Witten, 672 N.W.2d 768, 777-78 (Iowa 2003). If they cannot agree, then the status quo is maintained, and "the pre-embryos remain in storage indefinitely." Bilbao, 217 A.3d at 985. The contractual approach provides that a pre-existing agreement between the parties regarding the disposition of preserved pre-embryos is "presumed valid and enforceable." See, e.g., id. at 984, 992 (determining that the parties had an enforceable agreement); Kass v. Kass, 696 N.E.2d 174, 179 (N.Y. 1998) (holding that the parties' agreement controlled). The balancing approach requires a circuit court to weigh the parties' respective interests in the pre-embryos. Bilbao, 217 A.3d at 985.

---

[9] Numerous scholars have recognized this emerging issue. See, e.g., I. Glenn Cohen, The Constitution and the Rights Not to Procreate, 60 Stan. L. Rev. 1135 (2008); Elizabeth A. Trainor, Right of Husband, Wife, or Other Party to Custody of Frozen Embryo, Pre-embryo, or Pre-zygote in Event of Divorce, Death, or Other Circumstances, 87 A.L.R.5th 253 (2001); Susan B. Apel, Disposition of Frozen Embryos: Are Contracts the Solution?, Vt. B.J., Mar. 27, 2001, at 29.

The exceedingly rare mutual consent approach is disfavored.  See, e.g., Jocelyn P. v. Joshua P., 250 A.3d 373, 405 (Md. Ct. Spec. App. 2021); In re Marriage of Rooks, 429 P.3d 579, 592 (Colo. 2018); Reber v. Reiss, 42 A.3d 1131, 1136 (Pa. Super. Ct. 2012).  But see Witten, 672 N.W.2d at 783 (using this approach); cf. McQueen, 507 S.W.3d at 145-47 (affirming award of joint ownership to both of the spouses using the balancing approach).  Most jurisdictions that have considered the approach have held it to be impractical and unworkable.  See, e.g., Jocelyn P., 250 A.3d at 405; Rooks, 429 P.3d at 592; Reber, 42 A.3d at 1136.  As the Colorado Supreme Court persuasively explained, "[i]t is . . . unrealistic to think that parties who cannot reach agreement on a topic so emotionally charged will somehow reach resolution after a divorce is finalized."  Rooks, 429 P.3d at 592.

In contrast, the contractual approach, which recognizes the validity of a contract between the parties as governing the disposition of preserved pre-embryos, is embraced by the majority of jurisdictions that have addressed the issue.  See Jocelyn P., 250 A.3d at 381; Bilbao, 217 A.3d at 986, 992; Szafranski v. Dunston, 34 N.E.3d 1132, 1147 (Ill. App. Ct. 2015); In re Marriage of Dahl & Angle, 194 P.3d 834, 840 (Or. Ct. App. 2008); Roman v. Roman, 193 S.W.3d 40, 48 (Tex. App. 2006); Kass, 696 N.E.2d at 180; Davis v. Davis, 842 S.W.2d 588, 598 (Tenn. 1992), petition to rehear granted in part, No. 34, 1992 WL 341632 (Tenn. Nov. 23, 1992) (per curiam). But see Witten, 672 N.W.2d at 781 (rejecting this approach); A.Z. v. B.Z., 725 N.E.2d 1051, 1057 (Mass. 2000) (noting that it would not uphold an agreement between the parties if it "would compel one donor to become a parent against his or her will").

In the absence of such an agreement through contract, courts commonly use the third approach, which balances the parties' competing interests.  See, e.g., Jocelyn P., 250 A.3d at 380; Rooks, 429 P.3d at 593-94; Davis, 842 S.W.2d at 603-04.  "Recognizing a couple's cryogenically preserved pre-embryos as marital property of a special character, the underlying

principle that informs [the] balancing test is autonomy over decisions involving reproduction." Rooks, 429 P.3d at 593 (citation omitted).

In determining the best approach to resolving this case, we recognize and make clear that the disposition of the viable pre-embryo implicates both parties' constitutional rights. See, e.g., Obergefell v. Hodges, 576 U.S. 644, 666 (2015) (recognizing that choices related to procreation are constitutionally protected); Eisenstadt v. Baird, 405 U.S. 438, 453 (1972) ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."); McQueen, 507 S.W.3d at 144 (discussing the right to procreational autonomy in the context of a dispute over frozen pre-embryos); Davis, 842 S.W.2d at 598 (holding that resolution of the disposition of a pre-embryo "turns on the parties' exercise of their constitutional right to privacy").

If the parties are able to reach an agreement on the disposition of the pre-embryo, as required by the mutual consent approach, that agreement would certainly alleviate any constitutional concerns. However, we join with the circuit court and the courts in other jurisdictions that have recognized this approach as impractical. See, e.g., Rooks, 429 P.3d at 592; see also Reber, 42 A.3d at 1135 n.5 (holding that the mutual contemporaneous consent approach is "totally unrealistic" because "[i]f the parties could reach an agreement, they would not be in court"). Further, "the mutual contemporaneous consent approach," by permitting disposition of the pre-embryos only if the parties reach an agreement, "gives one party a de facto veto over the other party by avoiding any resolution until the issue is eventually mooted by the passage of time." Rooks, 429 P.3d at 589. As the circuit court explained here in rejecting the mutual consent approach, "making [the parties] decide later is making no decision at all." Consequently, we too reject this approach.

A contract entered into by the progenitors before their separation or divorce would also alleviate constitutional concerns and serves as a more traditional, equitable, and realistic approach. Generally, a party can knowingly and voluntarily waive a constitutional right through a contract. Burke v. Burke, 52 Va. App. 183, 188 (2008). In addition, Virginia law favors marital property settlements. Code § 20-109.1; Griffin v. Griffin, 62 Va. App. 736, 753 (2014), aff'd, 289 Va. 189 (2015). See generally Colleen M. Quinn & Mary McLaurin, Who Gets Our Future Children? The Need for Execution of Separate Embryo Disposition Agreements, 41 Va. Fam. L. Q. 7 (Fall 2021) (urging progenitors to create a separate agreement for pre-embryo disposition). Preexisting agreements regarding pre-embryos "'promote serious discussions between the parties prior to participating in [IVF],' . . . 'minimize[] misunderstandings' that might arise in the future, provide[] certainty for progenitors, . . . and decrease[] the likelihood of litigation." Bilbao, 217 A.3d at 986 (first quoting Szafranski v. Dunston, 993 N.E.2d 502, 515 (Ill. App. Ct. 2013); and then quoting Kass, 696 N.E.2d at 180). We hold that if a contract exists, it should be the controlling mechanism to resolve the dispute.

Absent such a contract, a court should employ the balancing approach, which balances the parties' interests to best respect their opposing constitutional rights. See McQueen, 507 S.W.3d at 144-45. We agree with this approach because it addresses constitutional concerns by taking the parties' competing constitutional interests into account. See id.

Having explained the proper framework of a blended approach, looking first for a contract and then, absent such, conducting a balancing of factors, we turn to this case. In resolving the dispute before this Court, we first consider whether the parties had an agreement controlling the disposition of the pre-embryo. Absent such an agreement, the next step in the analysis is to balance the parties' interests.

- 10 -

A.  Did the Parties Have a Controlling Agreement?

The only relevant contract here is the parties' agreement with Dominion Fertility, the fertility treatment center that they contracted with to develop and store the pre-embryos.  That agreement provides that in the event of the parties' divorce, "the ownership and/or other rights to the embryo(s) will be as directed by a court decree and/or settlement agreement."  This contract clearly does not purport to represent an agreement between the parties regarding the disposition of any remaining pre-embryos in the event of the parties' divorce.  In fact, to the extent it is relevant at all, it points directly to a divorce decree or settlement agreement in court.

A question that has arisen in this context is whether a party's agreement to contribute biological material for fertility purposes constitutes a binding agreement to permit the use of that material for purposes of procreation even in the event of separation or divorce.[10]  In this case, the parties did not discuss the allocation of the pre-embryos in the event of their divorce.  The wife testified that the subject arose when the parties signed the contract with the clinic but, instead of discussing the issue, they simply agreed that they would not divorce.  The husband testified that his intent in entering into IVF was to raise a child in a "nuclear family."  The husband's participation in the IVF process, by itself, did not establish that he agreed for each of the resulting viable pre-embryos to be used for reproductive purposes.  See Davis, 842 S.W.2d at 591 (rejecting a bright-line rule inferring "from the parties' participation in the creation of the

---

[10] The husband argues that the circuit court erred in concluding that he waived his constitutional rights in this regard by participating in IVF.  Without deciding whether the circuit court actually made this determination, we recognize that "[w]aiver is an *intentional* relinquishment of a known right."  See Va. Polytechnic Inst. & State Univ. v. Interactive Return Serv., Inc., 267 Va. 642, 651 (2004) (quoting Stanley's Cafeteria, Inc. v. Abramson, 226 Va. 68, 74 (1983)).  Nothing in the record here supports a conclusion that the husband intentionally waived his constitutional interest in his biological material by submitting it for IVF.  See, e.g., Rooks, 429 P.3d at 592 ("We do not interpret a party's commencement of the IVF process, on its own, to establish the party's automatic consent to become the genetic parent of all possible children that could result from successful implantation of the pre-embryos.").

embryos that they had made an irrevocable commitment to reproduction"). See generally Code § 20-158(C) (recognizing that divorce likely changes the progenitors' mutual intent to become parents that existed when the pair began the IVF process).

Based on the record, we conclude that the parties did not have an agreement in place addressing the disposition of any remaining pre-embryos in the event of a divorce.[11]

### B.  Balancing the Parties' Interests

In light of the impracticality of the mutual consent approach and the absence of a contract between the parties, the balancing test is the appropriate lens through which to analyze this case.[12]  The balancing test attempts to best resolve conflicting constitutional concerns when the parties disagree on what to do with preserved pre-embryos.[13]  This type of dispute impacts the constitutional right regarding procreational choice of both of the genetic donors.  See Obergefell, 576 U.S. at 666; Jocelyn P., 250 A.3d at 391 ("At its core, reproductive autonomy 'is composed of two rights of equal significance—the right to procreate and the right to avoid procreation.'" (quoting Davis, 842 S.W.2d at 601)).

Balancing the parties' respective interests in preserved pre-embryos requires consideration of numerous factors.  Those circumstances include the parties' intended use for the

---

[11] Because no agreement existed, a decision in this case does not require resolution of what type of agreement is necessary to bind the parties in this context.  See Commonwealth v. Swann, 290 Va. 194, 196-97 (2015) (applying best and narrowest ground principles).  See generally Jocelyn P., 250 A.3d at 404 (holding that such an agreement must express the actual intent of the parties and not merely contain boilerplate language from a third party such as a fertility center); Bilbao, 217 A.3d at 989 (holding that a written contract between the parties and the fertility facility was enforceable between the parties); Szafranski, 34 N.E.3d at 1147-48 (upholding an oral contract); J.B. v. M. B., 783 A.2d 707, 714 (N.J. 2001) (holding that a written contract was necessary).

[12] We note that balancing the interests of the parties is appropriate under these facts because the parties agreed that the pre-embryo is property.

[13] Depending on the particular case, the facts and circumstances may warrant a joint award of pre-embryos to the parties.  See McQueen, 507 S.W.3d at 156-59.

pre-embryos, their "original reasons for undergoing IVF," "the reasonable ability" of the party seeking the pre-embryos to have biological "children through other means," and "the potential burden on the party seeking to avoid becoming a genetic parent." Jocelyn P., 250 A.3d at 380; see also Rooks, 429 P.3d at 593-94; Davis, 842 S.W.2d at 603-04. In addition, courts should consider the possibility of a party's "bad faith and attempt to use the frozen pre-embryo[s] as leverage in the divorce proceeding."[14] Jocelyn P., 250 A.3d at 380. Finally, the court should consider any other factors pertaining to the parties' procreational autonomy. McQueen, 507 S.W.3d at 146-47.

The record does not reflect that the circuit court adopted the balancing approach. When asked to specify the approach it was taking, the court did not do so. Although the court noted that it considered "the equity of the positions of the parties" in evaluating their interests in the pre-embryo, comments such as referencing the wife's "right" and the husband's "wish" reflect confusion as to the law. Several places in the record reflect that confusion and lack of clarity.[15]

Having established the appropriate framework for the circuit court to employ, we remand this case for the court to make a determination in accordance with this opinion.[16] We note that in

---

[14] Further, we conclude that in balancing the parties' interests, a court should not "consider . . . 'reasonable alternatives,' such as adoption, available to the party seeking to become a genetic parent." Jocelyn P., 250 A.3d at 380 (quoting Rooks, 429 P.3d at 593-94). "[T]he relevant interest at stake is the interest in achieving or avoiding *genetic* parenthood . . . ." Rooks, 429 P.3d at 594. Therefore, the possibility of adoption or foster parenting does not affect this interest. See Reber, 42 A.3d at 1138 ("There is no question that the ability to have a biological child and/or be pregnant is a distinct experience from adoption.").

[15] Based on this record, we reject the wife's contention that the circuit court appropriately considered the relevant factors under the balancing framework. See generally Yarborough v. Commonwealth, 217 Va. 971, 978 (1977) (citing the general principle that a circuit court is presumed to apply the law correctly to the facts).

[16] The husband also argues that the circuit court erred by not giving him a monetary award commensurate with his marital share of the pre-embryo. In light of our decision to reverse and remand for reconsideration in accordance with this opinion, we do not reach this assignment of error.

considering the relevant factors, the court "is not required to quantify the weight given to each [one], nor is it required to weigh each factor equally."  See Marion v. Marion, 11 Va. App. 659, 664 (1991) (discussing generally the equitable distribution factors in Code § 20-107.3).  Instead, the court must balance the parties' respective interests in the preserved pre-embryo by considering the various relevant factors.

## III.  CONCLUSION

We have now established the appropriate analytical framework for deciding how to award a viable pre-embryo under this specific set of facts.  The trial court on remand should consider the relevant factors as it balances the merits of awarding the pre-embryo, including any current or additional evidence that exists relevant to the balancing approach.  See generally Vilseck v. Vilseck, 45 Va. App. 581, 592 (2005) (ordering that the record be reopened on remand).  Therefore, the trial court's judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.